**JACKSON HOLE CONSERVATION ALLIANCE and Richard Sheahan, Petitioners,**

v.

**Bruce BABBITT, in his official capacity as Secretary of the Interior, Robert Stanton, in his official capacity as Director of the National Park Service, John Cook, in his official capacity as Regional Director of Intermountain Region of the National Park Service, and Jack Neckels, in his official capacity as Superintendent of Grand Teton National Park, Respondents.**

No. 99–CV–152–B.

United States District Court, D. Wyoming.

May 15, 2000.

R. Scott Garland, Moore & Myers, Jackson, WY, for petitioners.

Thomas D. Roberts, Assistant U.S. Attorney, Cheyenne, WY, for respondents.

### *ORDER*

BRIMMER, District Judge.

This case arises out of a dispute over whether the National Park Service should construct a southwest entrance station at Grand Teton National Park. Petitioners, an environmental organization and an individual, challenge the National Park Service's decision to construct the entrance station, primarily based on perceived deficiencies in the Environmental Assessment prepared as part of the National Environmental Policy Act planning process. Respondents counter that the Environmental Assessment was adequate and challenge Petitioners' standing to bring this action. After reading the briefs, hearing oral arguments, and being fully advised in the premises, the Court **FINDS** and **ORDERS** as follows:

### *Background*

The National Park Service ("NPS") has announced a controversial plan to construct a new entrance station (the "Proposed Action") in the southwest portion of Grand Teton National Park (the "Park"). In the Environmental Assessment ("EA") prepared in conjunction with the Proposed Action, NPS stated that the Proposed Action was "needed because the increasing popularity of the southwest portion of [the Park] and expanding recreational activities in this area have created a situation where the volume of use, user conflicts, and visi-

tor and resource protection problems require increased intervention by [NPS]." (Admin.R. at 224.) NPS further noted increased pressure imposed by the construction of additional development adjacent to the park in the southwestern area. (*Id.* at 509–10.) NPS found that the lack of a permanent ranger presence in the southwest portion of the Park results in slow response to visitor emergencies, missed opportunities for fee collection, and disregard of NPS rules and regulations. (*Id.* at 224.) In particular, there have been problems of illegal mountain bike trail usage, dispersed visitor use, and development of unplanned and unauthorized trails. (*Id.*) There are no facilities in the southwest area to greet visitors and distribute information, nor are there restrooms for those visiting the nearby Granite Canyon Trail. (*Id.*)

To address these concerns, NPS proposed building new facilities in the southwest Park area. (*Id.*) The aims of the Proposed Action were to (1) improve visitor services and experiences; (2) improve resource protection through better law enforcement, access control, and improved information and educational opportunities; and (3) improve emergency services and visitor protection. (*Id.*) Secondarily, the Proposed Action would result in increased fee collection. (*Id.*)

As part of the EA process, NPS studied three alternatives for meeting the management objectives, as well as a fourth "no action" alternative. The preferred alternative, called Alternative A, included construction of an entrance station, which would involve widening 600 feet of the road to accommodate an island between the two lanes of traffic. (*Id.* at 229). An approximately 750 square foot building would be constructed on the island from which information would be distributed and fees would be collected. (*Id.*) Alternative A also provides for the potential future construction of a visitor contact station at which detailed park information would be distributed, maps and other materials would be sold, and various permits

would be issued. Construction of the visitor contact station would also necessitate expansion of the existing parking facilities by ten spaces. (*Id.* at 233.) Alternative A also provides for construction of a vault toilet restroom at the Granite Canyon trailhead parking area, and for the potential construction of a 2,000 to 3,000 square foot house or duplex in the Poker Flats area to accommodate one to two park rangers. (*Id.*)

The second alternative, Alternative B, would include an entrance station similar to the facility described in Alternative A, except that it would be located at the Park boundary rather than at the Granite Canyon trailhead. (*Id.* at 234.) As in Alternative A, Alternative B contemplates construction of vault toilets at the Granite Canyon trailhead. In contrast to Alternative A, however, no visitor contact station or ranger housing would be constructed under Alternative B. (*Id.*) Alternative C would involve construction of the same structures contemplated in Alternative A, except that the entrance station would be moved 500 feet north or south of the Granite Canyon trailhead, and the employee housing would be constructed near the trailhead rather than in Poker Flats.

In the EA, NPS considered impacts to air quality, water resources, biotic communities special status species, cultural resources, the socioeconomic environment, and the visitor experience. The EA concluded that each of the three construction alternatives would cause minor temporary increases in dust and vehicle emissions during the construction process. (*Id.* at 238.) These impacts would be diminished under Alternative B because Alternative B does not involve construction of employee housing or a visitor contact station. (*Id.*) The EA identified no adverse impacts to water quality, wetlands, or floodplains for all three of the construction alternatives, although Alternative B would require additional floodplain management because it would involve placing facilities in a potentially floodprone area. (*Id.*) As to impacts on biotic communities, NPS estimated that Alternatives A and C would entail a long

term impact on approximately 1.6 acres and could require trees to be cut. Alternative B would permanently impact only 1.0 acres because no housing or visitor contact station would be constructed, nor would Alternative B require removal of any trees. (*Id.*) NPS concluded that none of the alternatives would negatively impact special status species or cultural resources, while each construction alternative would create a small, short-term local economic benefit due to construction-related employment and expenditures. (*Id.*) NPS further determined that the increased NPS presence and visitor education associated with the construction alternatives could foster protection of sensitive resources while the "no action" alternative could lead to higher long-term costs and diminished visitor experiences. (*Id.*)

On August 6, 1998, NPS issued the Finding of No Significant Impact ("FONSI"). The FONSI announced NPS's decision to proceed with Alternative B because it entailed the least environmental disruption and the lowest cost. (*Id.* at 509–10.) The FONSI further pronounced NPS's conclusion that Alternative B could be implemented without significant adverse impacts to natural, cultural, or socioeconomic resources. (*Id.*)

On July 20, 1999, Petitioners filed a petition for review of agency action pursuant to Local Rule 83.7.2, as well as a motion for a preliminary injunction. Petitioners' motion for injunctive relief, which was converted to a motion for permanent injunction, was denied by this Court in a February 23, 2000 Order. Remaining before the Court is Petitioners' petition for judicial review of the FONSI.

The central focus of Petitioners' suit is that NPS failed to comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4331 *et seq.*, and NPS's own NEPA planning guidelines. In Petitioners' view, the EA prepared by NPS in conjunction with the Proposed Action was inadequate because it failed to consider options for meeting NPS objectives that did not require construction of

an entrance station, and failed to consider environmental impacts of actions connected to the Proposed Action. Petitioners also assert that NPS violated 16 U.S.C. § 1a–7 by failing to prepare a General Management Plan for the Park, and also failed to comply with other NPS planning guidelines. Finally, Petitioners claim that NPS violated 36 C.F.R. § 71.3, a Department of Interior regulation pertaining to establishment of fee collection areas.

## Analysis

### 1. Standing

Before the Court can reach the merits of Petitioners' claims, it must first address the "threshold jurisdictional question" of whether Petitioners have standing to sue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The constitutional standing requirement derives from Article III's limitation on the federal judicial power to adjudication of "cases" or "controversies." *Id.;* U.S. Const. Art. III, § 2. The Article III standing requirement ensures that the domain of the courts is limited to justiciable cases, and effectuates the Constitution's separation of powers function by preventing courts from engaging in activities more appropriately performed by legislatures or executives. *See Steel Co.*, 523 U.S. at 102, 118 S.Ct. 1003. "Standing to invoke the power of the federal courts is not a mere technical hoop through which every plaintiff must pass, but rather is 'a part of the basic charter promulgated by the Framers of the Constitution.'" *Utah v. Babbitt*, 137 F.3d 1193, 1202 (10th Cir. 1998) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 476, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). The "irreducible constitutional minimum of standing" consists of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, (b) actual or imminent, not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision. *Id.* at 560–61, 112 S.Ct. 2130 (internal quotations and citations omitted). "'[S]tanding jurisprudence is a highly case-specific endeavor, turning on the precise allegations of the parties seeking relief.'" *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir.1992) (quoting *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 703–04 (D.C.Cir.1988)).

Here, Petitioners base their assertion of standing on the affidavit of Petitioner Richard Sheahan. Mr. Sheahan states that he is a year-round resident of Poker Flats, an area located within the outer boundary of the Park which includes private inholdings. Mr. Sheahan's residence is located less than one mile from the proposed southwest entrance station. (Sheahan Aff. ¶¶ 1, 2.) Mr. Sheahan states that if the entrance station is built, he would have to pass through the station on a daily basis. (*Id.* ¶ 2.) He further claims that he and his wife use the Park "for spiritual, recreational, inspirational, educational, and other purposes on a regular basis and intend to do so frequently in the future," and that they enjoy the "open space and natural habitat remaining in the Poker Flats area." (*Id.* ¶ 4.) Mr. Sheahan contends that these interests would be adversely affected by the Proposed Action. (*Id.*)

### a. Petitioners' Standing to Challenge NPS's Compliance with NEPA

#### (i.) Injury in Fact.

If the sole basis of Petitioners' standing were Mr. Sheahan's recreational and aesthetic interests in the area impacted by the Proposed Action, Petitioners could not

meet the Tenth Circuit's strict adherence to the requirement of redressability. *See Baca v. King,* 92 F.3d 1031 (10th Cir.1996) (rancher lacked standing to challenge exchange of federal land he grazed pursuant to permit because only renewal of his grazing permit, and not prohibition of land exchange at issue in the case, would redress his injury); *Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1451 (10th Cir. 1994) (concession facility operator lacked standing to challenge Forest Service's decision not to rebuild concession facility after a fire because, even if the facility were rebuilt, there was no guarantee that the plaintiff would receive the concession contract). In brief, even if this Court were to determine that NPS's NEPA planning was inadequate, there is no guarantee that NPS would not reach the same decision to construct the entrance station under an improved planning regime.

Courts have recognized, however, that the procedural injury resulting from an agency's failure to comply with NEPA can serve as a basis for Article III standing. *See Committee to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 449–50 (10th Cir. 1996). Procedural injury standing developed from footnote seven of Justice Scalia's opinion in *Defenders of Wildlife,* which noted that

> [t]here is much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.... What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for

persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam.

*Defenders of Wildlife,* 504 U.S. at 572 n. 7. Following *Defenders of Wildlife,* the Tenth Circuit developed a two-pronged test for establishing Article III injury in fact based on an agency's failure to comply with NEPA:

> (1) the litigant must show that in making its decision without following the National Environmental Policy Act's procedures, the agency creates an increased risk of actual, threatened, or imminent environmental harm; and (2) the litigant must show that the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action.

*Rio Hondo,* 102 F.3d at 449.

■ The averments contained in Mr. Sheahan's affidavit are sufficient to satisfy the injury in fact standing element under *Rio Honcho.* Mr. Sheahan's averment that his "spiritual, recreational, inspirational, and educational" uses of the southwest portion of the Park would be harmed by the Proposed Action meets the requirement that NPS's alleged failure to comply with NEPA caused an increased risk of environmental harm. *See id.* at 450. (increased risk of harm found, in part, on the plaintiffs' recreational and aesthetic interests in the land at issue). Furthermore, the proximity of Mr. Sheahan's residence to the site of the Proposed Action, and his frequent use of the area, demonstrate his concrete interest in the dispute by virtue of his "geographical nexus to" and "actual use of" the area affected by the Proposed Action. *Id.* at 450–51 (concrete interest demonstrated by plaintiff's use of the subject area for hunting, hiking, and general aesthetic enjoyment).

**(ii.) Causation**

The second element of Article III standing requires Petitioners to show that their

injury in fact is "fairly · . . . trace[able] to the challenged action of the defendant." *Defenders of Wildlife,* 504 U.S. at 560–61. Where the plaintiff's injury in fact consists of a procedural injury resulting from the agency's failure to comply with NEPA, this burden is rather low. "[T]he plaintiff need only trace the risk of harm to the agency's alleged failure to follow [NEPA's] procedures. Under [NEPA] an injury results not from the agency's decision, but from the agency's uninformed decision-making." *Rio Hondo,* 102 F.3d at 452. Here, Petitioners met their burden through their contention that NPS's failure to consider certain environmental impacts and alternatives resulted in an increased risk to Mr. Sheahan's recreational and aesthetic interests.

Respondents, however, attempt to impose a more stringent burden on Petitioners, requiring them to specifically describe how the Proposed Action would cause harm to their recreational and aesthetic interests. However, the law requires no such showing.

> To require that a plaintiff establish that the agency action will result in the very impacts an [EIS] is meant to examine is contrary to the spirit and purpose of [NEPA]. [NEPA] was not intended to require the plaintiff to show with certainty, or even with a substantial probability, the results of agency action; those examinations are left to an [EIS].

*Id.*

**(iii.) Redressability**

The third element of Article III standing requires that it be " 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Defenders of Wildlife* 504 U.S. at 560–61, 112 S.Ct. 2130 (internal quotations and citations omitted). However, "[u]nder [NEPA], 'the normal standards for redressability' are relaxed; a plaintiff need not establish that the ultimate agency decision would change upon [NEPA] compliance." *Rio Hondo,* 102 F.3d at 452 (quot-

ing *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130). Petitioners procedural injuries are redressable because a decision favorable to them would require NPS to engage in additional NEPA planning, even though the entrance station might ultimately be built. *See id.* Therefore, Petitioners have met the three constitutional standing elements of injury in fact, causation, and redressability.

In addition to the Article III standing requirements, Petitioners' right to judicial review is contingent on their meeting the Administrative Procedures Act's requirement that they are "adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C.A. § 702 (West 1996). To satisfy this condition, Petitioners must show that their injuries fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The Tenth Circuit has made clear that recreational and aesthetic injuries fall within the zone of interests protected by NEPA. *Rio Hondo,* 102 F.3d at 448. Therefore, Petitioners are "adversely affected or aggrieved" within the meaning of NEPA, and are entitled to bring this action for judicial review.

**b. Petitioners' Standing to Challenge NPS's Compliance with 16 U.S.C. § 1a–7**

While the Tenth Circuit has accorded standing to environmental plaintiffs seeking to enforce compliance with NEPA, neither the Tenth Circuit nor any other court has had occasion to determine whether NPS's alleged violation of 16 U.S.C. § 1a–7 provides a basis for standing. The substance of § 1a–7 is that the Director of NPS must prepare, and the Secretary of Interior must deliver to Congress, a general management plan for each unit of the National Park System.[1] As discussed above, Mr. Sheahan's recreational and

---

1. Section 1a–7, in its entirety, reads as follows:

aesthetic injuries are not redressable in the traditional sense, and Petitioners' standing to bring their NEPA claim rests ultimately on the procedural rights bestowed by NEPA.[2] *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130 (observing that redressability and immediacy standards are relaxed for a person who has "been accorded a procedural right to protect his concrete interests.") Likewise, Petitioners have standing to challenge NPS's compliance with 16 U.S.C. § 1a–7 only if that statute provides them with a procedural right whose transgression constitutes an Article III injury in fact. *See Utah v. Babbitt,* 137 F.3d 1193, 1207 (10th Cir.1998).

▌Petitioners do not identify, nor does the Court find, any procedural rights granted to members of the public under § 1a–7. Most notably, in contrast to NEPA, § 1a–7 does not provide any opportunity for public participation or comment in the general management plan

> National Park System development program
> (a) Transmittal to Congressional committees
> Not later than January 15 of each calendar year, the Secretary of the Interior shall transmit to the Committee on Energy and Natural Resources of the Senate and the Committee on Natural Resources of the House of Representatives a detailed program for the development of facilities, structures, or buildings for each unit of the National Park System consistent with the general management plans required in subsection (b) of this section.
> (b) General management plans; preparation and revision by Director of National Park Service; list to Congress; contents
> General management plans for the preservation and use of each unit of the National Park System, including areas within the national capital area, shall be prepared and revised in a timely manner by the Director of the National Park Service. On January 1 of each year, the Secretary shall submit to the Congress a list indicating the current status of completion or revision of general management plans for each unit of the National Park System. General management plans for each unit shall include, but not be limited to:
> (1) measures for the preservation of the area's resources;

planning process. Petitioners' grievance, then, is not that NPS impermissibly forestalled their exercise of a procedural right, but rather, is that NPS failed to obey the law. The law is abundantly clear, however, that "the mere allegation that [a federal agency is] acting without authority or in violation of the law is insufficient to establish standing." *Utah v. Babbitt,* 137 F.3d at 1205. The Supreme Court "has repeatedly held that an asserted right to have the Government act in accordance with law in not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In sum, § 1a–7 does not accord procedural rights to interested members of the public, nor can its purported violation by NPS provide a basis for standing to Petitioners.[3]

## 2. The Administrative Record

Before turning to the merits of Petitioners' NEPA-related arguments, it is neces-

> (2) indications of types and general intensities of development (including visitor circulation and transportation patterns, systems and modes) associated with public enjoyment and use of the area, including general locations, timing of implementation, and anticipated costs;
> (3) identification of and implementation commitments for visitor carrying capacities for all areas of the unit; and
> (4) indications of potential modifications to the external boundaries of the unit, and the reasons therefor.
> 16 U.S.C.A. § 1a–7 (West 1992).

2. Among the procedural rights afforded to interested members of the public by NEPA, and the Council on Environmental Quality regulations promulgated pursuant to NEPA, are the right to participate in the EA process "to the extent practicable," 40 C.F.R. § 1501.4, the opportunity to participate in the EIS scoping process, 40 C.F.R. § 1501.7, and the opportunity to comment on draft EIS's, 40 C.F.R. § 1503.

3. Nor, as discussed *infra,* do NPS's planning guidelines grant procedural rights to Petitioners. Therefore, Petitioners cannot base their assertion of standing on NPS's alleged violation of its own planning documents.

sary to settle the parties' dispute regarding whether the Court should consider certain documents that are not part of the administrative record. As a general rule, a district court reviewing agency action pursuant to the Administrative Procedures Act functions as an appellate court, and limits its review to the administrative record. *See Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1580 (10th Cir.1994); *see also* 5 U.S.C.A. § 706. In this case, however, Petitioners have filed voluminous appendices containing various NPS documents which are not part of the administrative record, but which Petitioners contend should be considered by the Court, either by supplementation of the administrative record or by judicial notice. While most of the documents are only tangentially related to the issues presented by this case, two documents bear special attention. First is NPS's publication entitled "Planning Process Guideline, NPS-2."[4] The second is NPS's "National Environmental Policy Act Guidelines, NPS-12."[5] Petitioners contend that these documents should be considered because they were binding on NPS in its decisionmaking process. Respondents counter that the materials are not subject to judicial notice because they do not meet the requirements of Rule 201 of the Federal Rules of Evidence.[6]

In the Court's view, both parties err in characterizing this question as one of judicial notice. Rule 201 explicitly limits its scope to adjudicative facts, which "are simply the facts of the particular case," which are normally established "through the introduction of evidence, ordinarily consist-

ing of the testimony of witnesses." Fed. R.Evid. 201(a) advisory committee's note. Here, Petitioners seek consideration of NPS's planning guidelines, not as factual evidence, but as regulations which are binding upon NPS. In other words, Petitioners offer the documents as law, not as fact, and judicial notice is irrelevant. If Petitioner is correct that NPS-2 and NPS-12 have the force of law, they must be considered by the Court, notwithstanding their exclusion from the administrative record.

To determine the force and effect of NPS-2 and NPS-12, the Court must determine whether they are legislative rules or general statements of policy, a distinction which has been described as a "fuzzy" one. Kenneth Culp Davis, *Administrative Law Treatise* § 5.01, at 290 (1958) (quoted in *Pacific Gas & Elec. Co. v. Federal Power Commission,* 506 F.2d 33, 37 (D.C.Cir. 1974)). The distinction, however, is critical: "[A] valid legislative rule has the same binding effect as a statute; a general statement of policy has no binding effect on members of the public or on courts. A general statement of policy also is not judicially enforceable against an agency." Kenneth Culp Davis & Richard J. Piece, Jr., *Administrative Law Treatise,* § 6.2, at 228 (3d ed.1994) (citing *Rinaldi v. United States,* 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977)). The difference between a substantive rule and a general statement of policy has been described as follows:

A properly adopted substantive rule establishes a standard of conduct which has the force of law. In subsequent

4. NPS-2 sets out NPS's internal procedures for completing general management plans which NPS is required to prepare for each unit of the park under the National Parks and Recreation Act of 1978.

5. NPS-12 is an internal NPS document designed to assist NPS personnel in meeting the agency's obligations under NEPA. The document is based on NEPA, the Council on Environmental Quality's regulations issued pursuant to NEPA, and the Department of Interior's own NEPA regulations. NPS-12 also includes guidance for complying with

other NPS obligations under the Organic Act and other laws and policies. It appears that the principal purpose of the document is to present the environmental planning requirements in a more user-friendly, medium.

6. Rule 201 states that a fact is subject to judicial notice only if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.... A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*American Mining Congress v. Marshall,* 671 F.2d 1251, 1263 (10th Cir.1982) (quoting *Pacific Gas,* 506 F.2d at 38).

While the Tenth Circuit has not specifically addressed whether NPS's guideline documents are legislative rules or statements of policy, the Ninth Circuit squarely faced the issue in *Lake Mohave Boat Owners Ass'n v. National Park Service,* 78 F.3d 1360, 1363–64 (9th Cir.1995). *Lake Mohave* concerned NPS's guideline pertaining to concession management, NPS–48. The *Lake Mohave* plaintiffs contended that NPS violated NPS–48 in approving a concessionaire marina operator's request for a user fee increase, and further argued that NPS–48 was a legislative rule subject to the APA's notice an comment rulemaking requirements. 78 F.3d at 1363–64. Distinguishing "between directives that guide agency personnel in the exercise of discretionary authority, and those that establish a 'binding norm,' " the court determined that NPS–48 is a general statement of policy. *Lake Mohave,* 78 F.3d at 1369 (quoting *Mada–Luna v. Fitzpatrick,* 813 F.2d 1006, 1015 (9th Cir.1987)). Because NPS–48 was a mere general statement of policy, the Ninth Circuit determined in subsequent litigation that NPS's deviation from NPS–48 in setting marina fees was not per se arbitrary and capricious. *See Lake Mohave Boat Owners Ass'n v. National Park Service,* 138 F.3d 759, 762–63 (9th Cir.1998) (*"Lake Movhave II"*).

Like NPS–48, NPS–2 and NPS–12 are designed, not to regulate the conduct of the general public, but to assist NPS officials in complying with their discretionary duties arising under various other statutes, regulations, and internal policies. As internal guidelines not mandated by any statute or the Constitution, NPS–2 and NPS–12 "do not have the force of law and create no substantive rights in favor of any party." *In re Pan Am. World Airways, Inc.,* 777 F.Supp. 1179, 1183 (S.D.N.Y. 1991); *accord United States v. Craveiro,* 907 F.2d 260, 263–64 (1st Cir.1990). Therefore, NPS–2 and NPS–12 afford no rights to Petitioners, and any deviation from the dictates of NPS–2 or NPS–12 by NPS would not, in and of itself, constitute arbitrary or capricious action. *See Lake Mohave II,* 138 F.3d at 762–63.

### 3. NPS's Compliance with NEPA

The principal thrust of Petitioners' case is that Respondents failed to comply with NEPA in reaching the decision to construct the southwest entrance station. NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") detailing the environmental impacts of every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C.A. § 4332(2)(C) (West 1995). Agencies typically prepare an Environmental Assessment ("EA") to determine whether an EIS is warranted. *See* 40 C.F.R. § 1501.4(b). An EA is a "precise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a) It must contain "brief discussions of the needs for the proposal, of alternatives ..., of the environmental

impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). If the EA reveals that the proposed action is one "significantly affecting" the environment, the agency moves on to the EIS process. *See* 40 C.F.R. § 1501.4(c). On the other hand, where the agency concludes based on the EA that an EIS is not warranted, it issues a FONSI. *See* 40 C.F.R. § 1501.4(e).

The decision whether to prepare an EIS or issue a FONSI "is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review." *Committee to Preserve Boomer Lake Park v. Department of Transp.*, 4 F.3d 1543, 1555 (10th Cir.1993). Petitioners bear the burden of establishing that the Park Service's decision to issue a FONSI was arbitrary and capricious. *See id.* This burden is a heavy one, for the Court's scope of review is limited to "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Petitioners claim that NPS acted arbitrarily and capriciously by failing to consider adequate alternatives, failing to assess the environmental impacts of combined actions, and failing to address certain environmental impacts not discussed in the EA.

### a. Failure to Consider Alternatives

Petitioners complain that the three Alternatives considered by NPS all involved construction of an entrance station. Petitioners suggest that NPS could have met its objectives by "1) more conspicuous notice so that visitors would be aware they had entered the Park and 2) more intensive on-the-ground presence of NPS personnel to increase visitors' compliance with park rules and regulations, and to reduce visitors' adverse impacts on Park natural resources." (Br. of Pet'rs in Spp. Of Mot. for Prelim.Inj. at 15.) Petitioners have also suggested that a self-service fee payment and information kiosk could serve the same function as the entrance station.

Determining the alternatives to be studied "is a matter left to the agency's discretion." *Southern Utah Wilderness Alliance v. Dabney*, 7 F.Supp.2d 1205, 1213 (D.Utah 1998). In reviewing NPS's actions, the Court must "remain mindful that an agency decision concerning which alternatives to consider is necessarily bound by a 'rule of reason and practicality.'" *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir.1996) (quoting *Boomer Lake*, 4 F.3d at 1551). This means that the agency must "set forth only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1160 (9th Cir.1998). "An agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir.1984). It must also be noted that the agency's duty to consider alternatives in preparing an EA is a lower duty than the duty to consider alternatives in preparing an EIS. *Compare* 40 C.F.R. § 1508.9(b) (An EA need only "include brief discussions . . . of alternatives."), *and* 40 C.F.R. § 1502.14 (In preparing an EIS, agency must "[r]igorously explore and objectively evaluate all reasonable alternatives."). Likewise, NPS was within the bounds of its discretion in concluding that increased ranger patrols would not meet project objectives.

■ The Court finds that the Petitioners have failed to carry their burden of proving that NPS was arbitrary and capricious in failing to consider a "no construction" alternative involving increased signage and ranger patrols, or other less invasive alternatives. NPS made clear throughout the process that a principal objective of the Proposed Action was to create a visible ranger presence to act as

a deterrent to Park rule violations. (Admin.R. at 224.) NPS determined early in the process that a self-service fee payment system would not achieve its objective of providing a ranger presence. (*Id.* at 68.) Because NPS determined in good faith that a self-service station would be ineffective, it was not required to consider this alternative in the EA. *See City of Aurora,* 749 F.2d at 1467.

Within the range of options that would achieve NPS's goals, NPS considered sufficient alternatives "to permit a reasoned choice." *Presidio Golf Club,* 155 F.3d at 1160. NPS evaluated various construction configurations that would establish a ranger presence in the southwest portion of the Park, and ultimately selected the option involving the least environmental disruption. The range of options considered by NPS was abundantly reasonable in light of NPS's conclusion that none of the alternatives would cause significant environmental impacts. As the Fifth Circuit has observed, "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined ... will have no significant environmental effects anyway." *Sierra Club v. Espy,* 38 F.3d 792, 803 (5th Cir.1994).

### b. Failure to Consider Environmental Consequences of Connected Actions

Petitioners contend that the EA does not address the environmental consequences of actions that would necessarily be connected to the Proposed Action. Petitioners assert that

> it is axiomatic that the proposed entrance station in Poker Flats will be ineffective as a means of collecting entrance fees as long as visitors to the southwest region of the Park can access this area from Moose–Wilson Road or the Moose entrance station without paying an entrance fee. Therefore, relocating the northern terminus of the Moose–Wilson Road or the Moose entrance station must be in the works.

(Br. of Pet'rs in Spp. Of Mot. for Prelim.Inj. at 18.) Petitioners are correct that,

in determining whether an EIS is necessary, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). "[T]he test for whether particular actions could be considered cumulative impacts of the proposed action [is] whether the actions were 'so interdependent that it would be unwise or irrational to complete one without the others.'" *Airport Neighbors Alliance,* 90 F.3d at 430 (quoting *Park County Resource Council, Inc. v. U.S. Department of Agric.,* 817 F.2d 609, 623 (10th Cir.1987)).

Petitioners' speculation that the terminus of Moose–Wilson road, or the Moose entrance station will be moved does not meet this stringent test. Petitioners' argument is based upon the premise that fee collection is the sole justification for the Proposed Action, when in fact fee collection was only a secondary purpose. (Admin.R. at 224.) The principal purposes of the southwest entrance station—improved visitor education, resource protection, and emergency response—can certainly be achieved without moving the Moose–Wilson road terminus or the Moose entrance station. Therefore, it would not be "unwise or irrational" to complete the southwest entrance station without the other actions feared by Petitioners, and NPS was not required to consider those other actions in the EA prepared for the Proposed Action. *See Airport Neighbors Alliance,* 90 F.3d at 430–31.

### c. Failure to Consider All Environmental Impacts of the Proposed Action

The third failing of the EA, in Petitioners' eyes, is the EA's omission of certain other environmental impacts in the EA study. Petitioners assert:

> The significance of impacts to air quality from an unknown number of cars stopped, idling, at the new fee entrance station building is indeterminable. The significance of impacts to wildlife behavior from an unknown number of cars

stopped, idling, at the new fee entrance station building is indeterminable. The significance of impacts to wildlife behavior from construction of a vault toilet at the Granite Canyon Trailhead is indeterminable. Whether additional traffic, and even more impacts, will be generated by the publication of a "new entrance" to the Park, is indeterminable. The impact to visitors' current natural "back road" experience is unassessed, and indeterminable.

(Pet'rs' Supp.Br. at 23–24.) Perhaps, however, Petitioners' argument proves too much. If, as Petitioners contend, these additional impacts are truly "indeterminable," then an EA addressing these issues would have been futile. The Court is willing to accept Petitioners' assertion that an increase in vehicle emissions could result from idling cars waiting to pass through the entrance station. However, given the admitted difficulty in measuring this impact, and the likely insignificance of the increased air emissions caused by the entrance station, given that any vehicles passing through the station will already be entering the park, NPS was not arbitrary or capricious in failing to include this impact in the EA.

■ Contrary to Petitioners' assertion, the EA adequately addressed the wildlife impacts of the Proposed Action. The EA does note that a variety of wildlife, including at least 54 mammal species and 300 bird species, inhabit the area. The EA includes a more detailed assessment for endangered and threatened species in the area, including the American peregrine falcon, the whooping crane, the bald eagle, the grizzly bear, and the grey wolf. The EA concludes that the no high quality habitat for these species would be impacted by the Proposed Action. The Court concludes that NPS's assessment of wildlife impacts, focusing on endangered and threatened species, was reasonable under the circumstances. Quite simply, the Court cannot accept the logical consequence of Petitioners' contention that the wilderness study was inadequate: that a full-blown EIS is required every time NPS builds an outhouse.

Petitioners' final contention, that placing a fee collection station at a previously non-fee collecting entrance will attract visitors, is, by Petitioners' own admission, speculative. More important, Petitioners do not even attempt to identify significant environmental impacts that would flow from increased use of the southwest entrance. In sum, the Court concludes that Petitioners have failed to demonstrate that NPS ignored relevant factors or committed a clear error of judgment. Consequently, NPS's EA and FONSI must be upheld under the arbitrary and capricious standard of review. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. at 378, 109 S.Ct. 1851.

### 4. NPS's Compliance with 36 C.F.R. § 71.3

■ Finally, Petitioners complain that NPS failed to specifically make a finding that entrance fee collection is administratively and economically feasible, which Petitioners contend was required under 36 C.F.R. § 71.3. Putting aside significant questions regarding Petitioners' standing to bring a claim for violation of 36 C.F.R. § 71.3, Petitioners' argument obviously lacks merit. Section 71.3 pertains to creation of a Designated Entrance Fee Area. There is no dispute here that the Park has already been established as a fee area. Quite simply, 36 C.F.R. § 71.3 is inapplicable to NPS's decision to construct a new collection station for an existing fee area.

### Conclusion

NPS considered a reasonable range of alternatives in completing the EA process, and did not ignore cumulative impacts associated with the Proposed Action. Moreover, NPS acted reasonably in omitting the alleged impacts identified by Petitioners. Consequently, NPS's decision to is-

sue a Finding of No Significant Impact is **AFFIRMED.**