**ISLE ROYALE BOATERS ASSOCIATION, et al., Plaintiffs,**

v.

**Gale NORTON, et al., Defendants.**

**No. 2:99–CV–152.**

United States District Court, W.D. Michigan, Northern Division.

June 6, 2001.

Grant J. Merritt, Kalina, Wills, Gisvold & Clark, Minneapolis, MN, for plaintiffs.

Glenda G. Gordon, U.S. Attorney, Marquette, MI, for defendants.

### ORDER

QUIST, District Judge.

In accordance with the Opinion entered this day:

**IT IS HEREBY ORDERED** that Defendants' Motion to Strike Affidavits

(docket # 116) and Second Motion to Strike Affidavits (docket # 121) are **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (docket # 117) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (docket # 47) is **DENIED**.

This case is closed.

## OPINION AND ORDER

### Table of Contents

I. Facts ................................................................. 1108

II. Statutory Background ................................................ 1108
 A. National Park Service Organic Act ................................ 1109
 B. Isle Royale National Park Act ................................... 1109
 C. Isle Royale Wilderness Statute .................................. 1109
 D. The Wilderness Act ............................................. 1110
 E. Root–Bryce Treaty of 1909 ...................................... 1110
 F. National Environmental Policy Act .............................. 1111
 G. Rehabilitation Act and Americans With Disabilities ............. 1111

III. Motion Standard .................................................... 1111

IV. Motions to Strike .................................................. 1112

V. Analysis ............................................................ 1113
 A. Standing ........................................................ 1113
 B. Violations of Law ............................................... 1116
 1. Wilderness Act .............................................. 1116
 2. Isle Royale National Park Act ............................... 1119
 3. Root–Bryce Treaty ........................................... 1119
 4. Isle Royale Wilderness Act .................................. 1119
 5. National Park Service Organic Act and Isle Royale National Park Act .... 1124
 6. NEPA ........................................................ 1125
 a. Rigorous Analysis ........................................ 1127
 b. Lack of Site–Specific Analysis ........................... 1129
 c. Failure to Prepare Supplemental EIS ...................... 1131
 d. Failure to Disclose Critical Documents ................... 1132
 e. Lack of Accuracy and Integrity ........................... 1132
 7. Rehabilitation Act and the Americans with Disabilities Act .. 1134
 C. Arbitrary and Capricious Acts ................................... 1135

VI. Conclusion ......................................................... 1140

### OPINION

The controversy in this case centers around Isle Royale, a national park located on an island in the waters of Lake Superior. Plaintiffs, a group of motorboaters who regularly visit Isle Royale, filed this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 to 706, seeking review of a General Management Plan ("GMP") adopted by the National Park Service (referred to as "NPS" or collectively with the other defendants as "Defendants") to govern its administration of Isle Royale National Park for the next 15 to 20 years. Plaintiffs claim that the NPS acted arbitrarily and capriciously in adopting the GMP and that the GMP violates various laws. Now before the Court are the parties' cross motions for summary judgment.[1]

---

1. Gale Norton is substituted for Bruce Babbitt as a defendant pursuant to Fed.R.Civ.P. 25(d)(1).

## I. Facts

Isle Royale (sometimes referred to as the "Park") is a national park located in the waters of Lake Superior. In addition to being a national park, Isle Royale is also a federal wilderness area. Isle Royale is managed by NPS, which, as will be explained in the section of this Opinion regarding relevant statutes, enjoys broad statutory authority to regulate the Park. Beginning in February 1994, and pursuant to 16 U.S.C. § 1a–7 (which provides that "[g]eneral management plans for the preservation and use of each unit of the National Park System ... shall be prepared and revised in a timely manner by the Director of the National Park Service"), NPS began the process of preparing a GMP to guide its administration of the island. A series of public meetings were held, and in March, 1998, NPS produced a draft GMP, which also served as an Environmental Impact Statement ("EIS") required by the National Environmental Policy Act. The draft GMP contained five alternative plans (A—E), one of which was the preferred plan selected by Defendants. Comments on the draft GMP from the public and various government agencies were submitted to the NPS. Based on those comments, the NPS made revisions to the proposed plan. A final GMP/EIS was produced in August 1998. The GMP outlined the alternatives for managing the Park, identifying alternative D, as revised, as the proposed alternative. A record of decision ("ROD") selecting the proposed alternative was executed on May 11, 1999.

The goal of the proposed alternative was stated as follows:

> to meet the diverse expectations and needs of Isle Royale visitors while emphasizing the natural quiet that is fundamental to wilderness experiences. All park areas will be available to all visitors, so long as users participate in ways that are consistent with the access, facil-

ities, and opportunities provided. Management zones will provide guidance for managing specific areas for desired visitor experience and resource conditions. (ROD at 1, AR at 14799). In order to implement this goal,

> Campgrounds will be designed and access provided to separate motorized and non-motorized uses in a few areas; certain docks will be removed or relocated, for example, and some new campgrounds will be provided. A variety of uses will be available that will be fairly evenly distributed across the island. Use limits may become necessary in some management zones to prevent overcrowding and maintain quiet and solitude. Quiet/no-wake water zones will be established to reduce noise and wake impacts in numerous areas. Other regulations aimed at reducing sound associated with humans will also be implemented.

(*Id.*).

Plaintiffs disagree with numerous aspects of the proposed action as detailed in the GMP, particularly those affecting motorboaters. They filed this suit on August 18, 1999, and filed a first amended Complaint on March 6, 2000, requesting that this Court permanently enjoin NPS from implementing the GMP. Plaintiffs allege that the proposed actions of removing docks, shelters, and the Indian Portage Trail; dividing the Park into zones allowing varying levels of use and modification of the environment within these levels; and proposing the future creation of non-motorized zones, violate the statutes listed below, in spite of the broad authority these statutes give NPS to regulate and manage the Park.

## II. Statutory Background

The NPS, as a unit of the Department of the Interior, manages Isle Royale. The source of its statutory authority, and other

relevant statutes, follow. The sum provisions of these statutes are that Isle Royale is a National Park, a wilderness under the Wilderness Act, and is managed by NPS pursuant to statutory authority.

### A. National Park Service Organic Act

16 U.S.C. § 1, a section of the National Park Service Organic Act ("NPSOA"), enacted in 1916, creates the National Park Service. It provides:

> There is created in the Department of the Interior a service to be called the National Park Service, which shall be under the charge of a director .... The service ... shall promote and regulate the use of the Federal areas known as national parks ... by such means and measures as conform to the fundamental purpose of the said parks, ... which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

In addition, 16 U.S.C. § 1a–2(h) affirms NPS' authority to

> [p]romulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States: Provided, that any regulations adopted pursuant to this subsection shall be complementary to, and not in derogation of, the authority of the United States Coast Guard to regulate the use of waters subject to the jurisdiction of the United States

### B. Isle Royale National Park Act

The provisions designating and governing Isle Royale's creation as a national park, adopted in 1931, are contained at 16 U.S.C. §§ 408–408*l*. (The "Isle Royale National Park Act" or "IRNPA"). Section 1 of IRNPA provides that "[w]hen title to all alienated lands within Isle Royale in Lake Superior ... and immediately surrounding islands ... shall have been vested in the United States, ... said area shall be, and is hereby, established, dedicated, and set apart as a public park for the benefit and enjoyment of the people...." 16 U.S.C. § 408. Section 3 of IRNPA provides that: "The administration, protection, and development of the aforesaid park shall be exercised under the direction of the Secretary of the Interior by the National Park Service, subject to the provisions of [NPSOA]." 16 U.S.C. § 408b. The boundaries of the Park "include any submerged lands within the territorial jurisdiction of the United States within four and one-half miles of the shoreline of Isle Royale and the surrounding islands ...." 16 U.S.C. § 408g.

### C. Isle Royale Wilderness Statute

Isle Royale was made a part of the nation's wilderness system by the Act of October 20, 1976, Pub.L.No. 94–567, 90 Stat. 2692 (1976). The relevant provisions of this statute provide

> [t]hat in accordance with section 3(c) of the Wilderness Act the following lands are hereby designated as wilderness, and shall be administered by the Secretary of the Interior in accordance with the applicable provisions of the Wilderness Act:
>
> . . . . .
>
> (f) Isle Royale National Park, Michigan, wilderness comprising one hundred and thirty-one thousand eight hundred and eighty acres, and potential wilderness

additions comprising two hundred and thirty-one acres . . . .

*Id.*

The legislative history of this act contains the following language: "The Committee understands that no significant expansion of boat docks numbers [sic] is anticipated, but that continued maintenance of these facilities is essential to the continued ease of access as well as the health and safety of the visitors." S.Rep. No. 94–1357, at 5 (1976).

### D. *The Wilderness Act*

The Wilderness System itself was established in 1964 by the Wilderness Act, 16 U.S.C. § 1131 to 1136.

The Wilderness Act provides that

it is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness. For this purpose there is hereby established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as "wilderness areas", and these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness.

16 U.S.C. § 1131(a). Wilderness areas are declared to be areas which "ha[ve] outstanding opportunities for solitude or a primitive and unconfined type of recreation." 16 U.S.C. § 1131(c)(2).

16 U.S.C. § 1131(b) provides that "[t]he inclusion of an area in the National Wilderness Preservation System notwithstanding, the area shall continue to be managed by the Department and agency having juris-

diction thereover immediately before its inclusion in the National Wilderness Preservation System unless otherwise provided by Act of Congress." Thus, under this provision, NPS continues to manage Isle Royale.

16 U.S.C. § 1133(a)(3) clarifies NPS' authority to manage Isle Royale; it provides that

[n]othing in this Act shall modify the statutory authority under which units of the national park system are created. Further, the designation of any area of any park, monument, or other unit of the national park system as a wilderness area pursuant to this Act shall in no manner lower the standards evolved for the use and preservation of such park . . . in accordance with [NPSOA].

16 U.S.C. § 1133(b) provides guidance for any agency administering a wilderness area:

Except as otherwise provided in this Act each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character. Except as otherwise provided in this Act, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historic use.

### E. *Root–Bryce Treaty of 1909*

The Root–Bryce Treaty of 1909, also known as the Boundary Waters Treaty, provides that with respect to boundary waters between the United States and Canada:

The High Contracting Parties agree that the navigation of all navigable boundary waters shall forever continue free and open for the purposes of commerce to

the inhabitants and to the ships, vessels, and boats of both countries equally, subject, however, to any laws and regulations of either country, within its own territory, not inconsistent with such privilege of free navigation and applying equally and without discrimination to the inhabitants, ships, vessels, and boats of both countries.

36 Stat. 2448. *See also Minnesota v. Block,* 660 F.2d 1240, 1257 (8th Cir.1981) (quoting treaty language).

### F. *National Environmental Policy Act*

The National Environmental Policy Act of 1969 requires that agencies proposing a major federal action significantly affecting the quality of the human environment must prepare a detailed statement regarding the environmental impact of the proposed action, including an analysis of alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). This statement is referred to as an EIS. NEPA is meant to foster better decision-making and informed public participation for actions that affect the environment. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(b), (c).

### G. *Rehabilitation Act and Americans With Disabilities Act*

Section 504(a) of the Rehabilitation Act prohibits discrimination against qualified individuals with a disability "under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). Similarly, Title II of the Americans with Disabilities Act (the "ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.

### III. Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id.* at 251, 106 S.Ct. at 2511 (citing Schuylkill and Dauphin *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1871)).

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi,* 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th

Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

■ Because Plaintiffs' claims in this case are brought under the Administrative Procedure Act ("APA"), the scope of the Court's review is very narrow. In an APA review, a court may set aside an agency's decision only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A), (E); *Neighbors Organized to Insure a Sound Env't, Inc. v. McArtor*, 878 F.2d 174, 178 (6th Cir.1989). In applying this standard, "the Court must consider whether the agency acted within the scope of its legal authority, adequately explained its decision, based its decision on facts in the record, and considered the relevant factors." *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F.Supp.2d 7, 11 (D.D.C.1999). Although the standard is deferential, "the agency must articulate a 'rational connection between the facts found and the choice made.'" *GTE Midwest, Inc. v. FCC*, 233 F.3d 341, 344–45 (6th Cir.2000)(quoting *City of·Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1165 (D.C.Cir.1987)).

## IV. Motions to Strike

■ Defendants have moved to strike the affidavits filed by Plaintiffs in support of their motion. In their first motion to strike, Defendants request that the Court strike the affidavits of John E. Kappler and Fred Bieti attached to Plaintiffs' memorandum in support of their motion for summary judgment. Those affidavits are primarily addressed to the issue of whether Defendants used accurate figures in the GMP/EIS as required by the National Environmental Policy Act and the regulations under that Act. Defendants' second motion requests that the Court strike the affidavits of James P. Markham, Fred Bieti,

Edward T. Glowacki, John E. Kappler, and David W. Hand, submitted by Plaintiffs with their response to Defendants' motion for summary judgment. Those affidavits are primarily concerned with the issue of standing.

■ A court's review of an agency's decision is generally confined to the administrative record, which includes all the materials before the agency at the time it made its decision. *See Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir.1997). Thus, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). However, courts have recognized limited exceptions to the general rule. For example, the record may be supplemented when the agency deliberately or negligently excludes documents, to provide background information pertaining to whether the agency considered all the relevant factors, and to determine whether the agency's inquiry was adequate. *Slater*, 120 F.3d at 638; *Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291, 1308 (W.D.Wash.1994).

The Court finds that the first Kappler and Bieti affidavits may be properly considered under the limited exceptions noted above because they go to the issue of whether Defendants used inaccurate figures in violation of NEPA and are primarily based on matters in the administrative record. However the affidavits will be ignored to the extent that they are argumentative or question the mental processes used by Defendants in reaching their decision. The Court will also consider the second set of affidavits solely on the limited issue of standing. Therefore, Defendants' motions to strike will be denied.

## V. Analysis

### A. *Standing*

Defendants initially argued that Plaintiffs did not have standing, but subsequently abandoned this claim at oral argument. However, standing is a jurisdictional issue, *Vermont Agency of Natural Resources v. United States,* 529 U.S. 765, 771, 120 S.Ct. 1858, 1861, 146 L.Ed.2d 836 (2000), and "[t]he requirement that jurisdiction be established as a threshold matter 'spring[s]' from the nature of limits of the judicial power of the United States' and is 'inflexible and without exception.' " *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)(quoting *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884)). "For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Id.* at 101, 118 S.Ct. 1003. Therefore, this Court will examine the issue of standing *sua sponte.*

*Sierra Club v. Slater,* 120 F.3d 623 (6th Cir.1997), establishes Plaintiffs' standing in this case in most respects. In that case, the court noted that "it appears well-established that a final EIS [environmental impact statement] or the ROD issued thereon constitute the 'final agency action' for purposes of the APA." *Id.* at 631. The GMP in this case also serves as the final EIS. Therefore, Plaintiffs have standing to bring this suit. Plaintiffs are also appropriate parties to bring the suit because they engage in motorboating in and around the Park and face injury to these interests if Defendant carries out its plans under the GMP. *See Jackson Hole Conservation Alliance v. Babbitt,* 96 F.Supp.2d 1288, 1293–95 (D.Wy.2000) (stating that " 'geographical nexus to' and 'actual use of' the area affected by the Proposed Action" give plaintiff standing under NEPA and

concluding that the causation and likely relief prongs of standing were met where plaintiff alleged violation of NEPA procedures and favorable result for plaintiff could force additional agency planning)(quoting *Committee to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 450–51 (10th Cir.1996)).

Plaintiffs do not have standing to assert a violation of NPS–12. *See Jackson Hole,* 96 F.Supp.2d at 1294–97. NPS–12 is merely an unenforceable statement of policy by the agency. *Id.* Similarly, Plaintiffs have no standing to sue Defendants for violating the "statement of park purpose" contained on page 13 of the GMP and the statement of the "overall concept" contained on page 34 of the GMP, since these are merely general policy statements by Defendants, not sources of positive rights for Plaintiffs. *Id.*

Plaintiffs have standing under the ADA and the Rehabilitation Act. Plaintiffs stated in their complaint that the membership of the Isle Royale Boaters' Association includes members who are disabled. Since "Rule 56(e) ... requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56), a mere statement in the complaint that Plaintiffs' membership includes disabled members is not sufficient to establish that Plaintiffs suffer from disabilities.

In several of Plaintiffs' affidavits, affinis allege that they will suffer harm as a result of the impact of the proposed action on themselves and disabled family or friends. (Markham Aff. ¶ 7; Bieti Aff. ¶¶ 10 and 11; Glowacki Aff. ¶ 7; Kappler Aff. ¶ 3, Pls.' Resp. Defs.' Mot. Exs. A–D.)

This Court must determine whether these allegations give Plaintiffs standing to sue under the ADA or Rehabilitation Act.

■ All of Plaintiffs' allegations other than Kappler's involve ADA and Rehabilitation Act challenges in which Plaintiffs do not allege that they are themselves handicapped or disabled. A threshold question regarding Plaintiffs' standing under the ADA and Rehabilitation Act is whether Plaintiffs have standing to challenge violation of those acts if they are not handicapped but are affected by the alleged violations. The Rehabilitation Act extends its remedies to "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 504 of this Act." 29 U.S.C. § 794a(a)(2). In reviewing this provision, the court in *Weber v. Cranston School Committee*, 212 F.3d 41 (1st Cir.2000), stated:

> Courts have construed the phrase "any person aggrieved" as an expression of Congressional intent to accord standing to the fullest extent permitted by the case and controversy provision of Article III. *See, e.g., Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 208, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) ...; *Hackett v. McGuire Bros., Inc.*, 445 F.2d 442, 446 (3d Cir.1971) ...; *see also Gray v. Greyhound Lines, East*, 545 F.2d 169, 176 (D.C.Cir.1976).... Consistent with the broad construction of the statutory enforcement language of Title VI and the Rehabilitation Act, the anti-retaliation regulation applies to "any individual" who has been intimidated, threatened, coerced, or discriminated against "for the purpose of interfering with [protected rights]" under Title VI of the Civil Rights Act or the Rehabilitation Act. 34 C.F.R. § 100.7(e); *see id.* § 104.61 (incorporating the Title VI anti-retaliation regulation into the Rehabilitation Act).

> Given the broad remedial provisions of Title VI and the Rehabilitation Act and the breadth of the anti-retaliation regulation adopted pursuant to those laws, it is not surprising that courts have accorded standing to non-disabled individuals suing because of retaliation for attempts to vindicate the rights of a disabled person.

*Id.* at 48–49. While this case does not involve retaliation against Plaintiffs for attempting to vindicate the rights of the disabled, it remains the case that 29 U.S.C. § 794a(a)(2) provides remedies for *"any person* aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 504 of this Act." *Id.* (emphasis added). The Department of the Interior is a "Federal provider of ... assistance under section 504 of this Act"; it provides assistance to a "department, agency, special purpose district, or other instrumentality of a State or of a local government", 29 U.S.C. § 794(b)(1)(A). *See* 43 C.F.R. §§ 17.1, 17.2 and 17 App. A to Subpart A (dealing with "program[s] or activit[ies] receiving Federal financial assistance from the Department of the Interior", 43 C.F.R. § 17.1, and listing "program[s] for which financial assistance is authorized under a law administered by the department [of the Interior], including programs and activities that are federally-assisted under the laws listed in appendix A to this subpart." 43 C.F.R. § 17.2(a).) Therefore 29 U.S.C. § 794a(a)(2) applies to the Department of the Interior, and the broad remedies provision of that statute means that non-disabled individuals who are affected by discrimination against disabled individuals can have standing to bring suit under the Rehabilitation Act if they are directly affected by the action taken against the disabled individual.

The same logic applies to the ADA claim in this case. The only section of the ADA

under which this claim may conceivably be brought is 42 U.S.C. § 12132, and the ADA provides that "[t]he remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973 (29 U.S.C. 794a) shall be the remedies, procedures, and rights this title provides to any person alleging discrimination on the basis of disability in violation of section 202 [42 U.S.C. § 12132]." 42 U.S.C. § 12133. Thus, Plaintiffs have standing to sue under the ADA on the same terms as under the Rehabilitation Act even though they are not themselves disabled.

Paragraph 11 of Bieti's affidavit notes that due to a congenital heart defect, his son was required to have refrigerated medicine at the Park. Paragraph 10 of that affidavit notes that imposition of a no-generator rule makes carrying refrigerated medicines impossible in affected areas. However, as to Bieti's son, the allegations are in the past tense, ("[w]hen he was younger and we were boating at Isle Royale, we were required to keep life saving rectal morphine suppositories on board" (Bieti Aff. ¶ 11)), with no claim that this situation exists at present. In paragraph 10 Bieti states that because of the no-generator rule, he and his wife can no longer camp with a physician and his wife who need to keep refrigerated medicines they carry for visitor protection. To have standing under the ADA, an affected individual must have a disability which " 'substantially limits one or more of the major life activities of [an] individual . . . .' " *Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir.1997) (quoting 42 U.S.C. § 12102(2)) (alteration in original). Plaintiffs must succeed in establishing specific facts showing that Defendant is not entitled to judgment in order to survive a motion for summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The mere allegation that this doctor carries medicines for visitor protection does not establish that the doctor is disabled or that

the medicines are for persons with a disability. The Bieti affidavit does not establish standing under the ADA. Similarly, because the standards for determining a disability under the Rehabilitation Act and the APA are the same, *see Thompson v. Williamson County*, 219 F.3d 555, 557 n. 3 (6th Cir.2000), this Court finds that Bieti does not show standing to sue under the Rehabilitation Act.

Paragraph 7 of the Glowacki affidavit alleges that Glowacki's wife has "two specific chronic health issues that preclude[ ] her[ ] from taking on backpacking due to its strenuous nature", and that for this reason they usually dock at Chippewa Harbor and use the Indian Portage Trail, which the GMP proposes be removed. (Glowacki Aff. ¶ 7.) However, the Sixth Circuit has established that "moderate difficulty or pain experienced while walking does not rise to the level of a disability." *Penny*, 128 F.3d at 415. While Ms. Glowacki may have extreme difficulty walking, Mr. Glowacki has not established this in his affidavit. His wife may have nothing more than moderate difficulty or pain while walking. Accordingly, Mr. Glowacki has not established that he has standing under the ADA or the Rehabilitation Act.

Paragraph 3 of Kappler's second affidavit alleges that the closing of Indian Portage Trail "would again serve to discourage or limit certain categories of visitors such as the older group of which I am a member at age 57 from hiking Isle Royale." (Kappler Aff. ¶ 3.) As with Glowacki's allegations, these allegations are not sufficient to establish that Kappler is handicapped for purposes of the ADA or Rehabilitation Act, since they do not establish anything other than "moderate difficulty or pain experienced while walking", *Penny*, 128 F.3d at 415, if they establish that.

The only remaining allegation of effects on the handicapped appears at Paragraph 7 of the Markham affidavit. This paragraph states:

> Each year I make one trip to Isle Royale solely for the purpose of taking a handicapped friend. This individual has limited mobility. For him to leave the boat and experience the island itself, the boat must be secured to a dock that is large enough and strong enough to transfer him ashore.... he also requires medication that must be refrigerated, which makes a lot of the places that I used to take him not available because I cannot use my onboard generator.

(Markham Aff. ¶ 7.) Walking is a major life activity, *Penny*, 128 F.3d at 415, and an individual who cannot get out of a boat and onto Isle Royale without the use of a dock is substantially limited in his ability to walk. Therefore, the facts alleged in the Markham affidavit are sufficient to allow Plaintiffs standing under the ADA and Rehabilitation Act.

▮ Article III standing requirements are met by Plaintiffs' allegations. Article III standing requires actual injury, that the injury can fairly be traced to the challenged conduct, and that the injury can be redressed by the relief requested. *See Weber*, 212 F.3d at 47 n. 7 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Plaintiffs will not be able to make visits to areas of the Park as they have in the past because of changes proposed by the GMP; and changes would not occur if this Court struck down or altered the GMP.

▮ Plaintiffs have standing on all other issues. Though the court in *Jackson Hole* held that plaintiff did not have standing to sue under 16 U.S.C. § 1a–7, this Court agrees with the 9th Circuit, which has found that plaintiffs do have standing to sue under the National Park Service Organic Act. *See Alaska Wildlife Alliance v. Jensen*, 108 F.3d 1065, 1070 (9th Cir. 1997) (addressing plaintiff's claims under the Organic Act on the merits). Plaintiffs also have standing to sue under the Wilderness Act and the Isle Royale Enabling and Wilderness Acts. *See id.* at 1069 (addressing plaintiff's claims under the Wilderness Act on the merits); *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1121–25 (8th Cir.1999) (addressing plaintiffs' claims under the Boundary Waters Canoe Area Wilderness Act, Publ. L. No. 95–495, 92 Stat. 1649 (1978) on the merits). This Court sees no reason not to hold that Plaintiffs have a legal interest under any of these Acts, which contain substantive or procedural provisions which benefit those who visit national parks and wildernesses. *See, e.g. Alaska Wildlife*, 108 F.3d at 1070 (stating that "the Secretary [of the Interior] may not exercise his authority to the detriment of the [NPS Organic] Act's purpose," which is to "conserve the scenery and the natural and historic objects ... and to provide for the enjoyment of the same in such manner ... as will leave them unimpaired for the enjoyment of future generations").

## B. *Violations of Law*
### 1. *Wilderness Act*

Plaintiffs allege that the removal of docks, shelters,[2] and the Indian Portage

---

2. Four shelters are proposed to be eliminated as inconsistent with their proposed zoning as backcountry or primitive zones. (GMP at 36–37.) Under the GMP, fourteen others will no longer be accessible to motorboaters by docks. This leaves 70 shelters accessible by docked motorboaters. (1st Am. Compl. ¶ 24; Answer ¶ 24; GMP at 35.) The remaining 14 shelters could, of course, be accessed by motorboaters in the same way they will be accessed by others: via hiking, canoeing, etc.

Trail; dividing the park into zones allowing varying levels of use and modification of the environment within these levels; and proposing the future creation of nonmotorized zones, violate the Wilderness Act and accompanying regulations. Plaintiffs also allege that the zoning provisions violate the rights of the holders of life leases within the Park. Plaintiffs further allege that these actions violate one of the statements of park purpose on page 13 of the GMP.

■ Plaintiffs claim that Defendants' actions violate the following Wilderness Act regulation:

Regulations respecting administration and use of areas under the jurisdiction of the Secretary [of the Interior] which may be designated as wilderness areas by statute shall be developed with a view to protecting such areas and preserving their wilderness character for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, with inconsistent uses held to a minimum.

43 C.F.R. § 19.6. On page 13 of the GMP, the NPS notes its intention to "preserve and protect the park's wilderness character for use and enjoyment by present and future generations." (GMP at 13.)

Removal or replacement of four docks is not arbitrary and capricious. 16 U.S.C. § 1133(c) provides that there should generally be no motorboats allowed in wilderness areas except as necessary to meet the minimum requirements of the administration of the area. 16 U.S.C. § 1133(d) provides that where motorboat uses have already been established within an area that becomes wilderness, such use may be permitted to continue "subject to such restrictions as the Secretary of Agriculture deems desirable." While in this case it is the Secretary of the Interior, or the NPS, that regulates Isle Royale, there is no

reason that 1133(d) should not apply to their regulation of the Park. Even if it did not, the NPS maintains the ability under 16 U.S.C. §§ 1, 1131(b) and 1133(a)(3) to regulate the Park. These decisions are based on their zoning of the island. While Plaintiffs will not have access to these particular docks any longer, they will in fact have access to more docks after the plan is completed than they currently do. (GMP 34–37.) The ability to replace particular docks is part of the NPS' ability to regulate the Park.

The removal of the breakwater is explained at page 37 of the GMP as justified by separation of park uses and the removal of an impediment to natural current and sedimentation. Therefore, contrary to Plaintiffs' assertion, this action is adequately explained.

Safety concerns of removal of docks are addressed at page 142 of the GMP. The GMP notes that "protected bays, coves, and lee sides of islands" provide safe places for boats during storms. The safety of boaters has not been ignored under the GMP.

Similar logic prevails regarding Plaintiff's access to shelters and campgrounds. The Wilderness Act generally prohibits shelters in wilderness areas. A lessening of the number of shelters readily accessible to motorboaters from 88 to 70 cannot be said to be arbitrary and capricious in these circumstances. The possible lessening of campgrounds immediately accessible to boaters is not sufficient in this case to be deemed arbitrary and capricious. In fact, there will be 22 docks with campgrounds on Lake Superior under the GMP, as opposed to 20 currently. (GMP at 35.) Moreover, as Defendants point out, Plaintiffs will maintain the ability to access all shelters in the same way as nonmotorboaters: by hiking, kayaking, canoeing, etc., to those particular campgrounds.

■ The decision to eliminate Indian Portage Trail is also not arbitrary and capricious. Indian Portage Trail was proposed to be eliminated to relieve use pressure, separate uses, and protect archaeological resources. (GMP at 36–37, 150). NPS did not ignore the recommendations of Dr. Rolf Peterson in making this decision. Dr. Peterson, the principal investigator of wolf-moose research at Isle Royale, informed NPS that "[w]here wolves are concerned the effect of removing this trail is just as apt to be negative as positive"; that "there is some value in leaving (or maintaining) things as they are"; but that "I doubt very much that there will be any influence on wolves" by removing this trail. (AR at 13509.) NPS specifically noted in the GMP that "[w]ildlife information was consulted during development of this plan in an attempt to avoid sensitive habitats.... Researchers and other resource experts were consulted. Some displacement of wildlife could result from dispersal of visitation around the island .... This impact would be minor." (GMP at 109.) These findings are consistent with those of Dr. Peterson. Furthermore, the GMP went on to note that "[s]tudy of the wolf and moose relationship on Isle Royale has already produced significant results" and that "convening a panel of subject matter experts if dramatic wolf population changes occur would involve those who would benefit substantially from continued research." (GMP at 109.) The Court notes that no evidence pointed out in the record establishes the likelihood of such a change. NPS did not ignore Dr. Peterson's findings regarding the potential effect on the wolf population of removing Indian Portage Trail and did not act arbitrarily and capriciously in proposing the removal of that trail.

■ 16 U.S.C. § 1 creates NPS and gives it the power to regulate the national park system. Pursuant to this authority, NPS zones areas within its jurisdiction to determine the level and type of use of a given area. Under 16 U.S.C. § 1131(b) and 1133(a)(3), NPS maintains the ability to control Isle Royale, which was under NPS's jurisdiction prior to its designation as wilderness. Thus, NPS may properly engage in the zoning of areas of Isle Royale. This zoning does not consist of either removing or placing areas into or out of wilderness status by NPS. Rather, it involves regulating use either within or outside of Congressionally approved wilderness areas. Unless the zoning violates the Wilderness Act, it is permissible.

The zoning does not violate the Wilderness Act. The proposed zoning comports with 16 U.S.C. § 1133(c)'s provision that "except as necessary to meet minimum requirements for the administration of the area ... there shall be no ... structure or installation within any such area." Defendants have proposed a minimal amount of additional campsites, in keeping with allowing the public access to the Park. Defendants have not "removed" Raspberry Island or a portion of McCargoe Cove from wilderness status. They do propose classifying them as frontcountry or wilderness portal areas. NPS may alter these areas for "essential visitor and park operational needs," (GMP at 30–31), but this is consistent with 16 U.S.C. § 1133(c)'s mandates. NPS has not proposed building anything in these areas other than a campground, which is neither a structure nor installation. (GMP at 34 ("Because all new campgrounds would lie within designated or potential wilderness areas, no shelters would be constructed").) Furthermore, this campground is reasonably deemed by NPS to be necessary to meet essential Park needs.

NPS has also not classified nonwilderness areas in and around Barnum Island, Siskiwit Bay, Moskey Basin, Threemile Campground, or McCargoe Cove as wil-

derness. NPS has proposed that some areas in these locations are to be designated as backcountry. Backcountry zoning is more restrictive than developed, frontcountry, and wilderness portal zoning, but is not an attempt by NPS to classify these areas as wilderness. Instead, such a classification is within the NPS' discretion to manage the Park under the statutes already mentioned.

 Plaintiffs do not have standing to pursue their claims regarding NPS' possible future determination of nonmotorized zones. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), establishes that in order to have standing to sue, "[f]irst, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' " *Id.* at 560, 112 S.Ct. at 2136 (citations omitted). The GMP states that "[i]f goals for quiet are not met in the quiet/no-wake zone, and substantial compliance with noise regulations cannot be achieved, creation of some nonmotorized areas would be considered through an amendment to the *General Management Plan*." (GMP at 37 (italics in original).) Plaintiffs have not suffered an "actual or imminent" harm under this provision, since whether or not any action will be taken towards implementing nonmotorized zones depends on what happens after the implementation of the quiet/no-wake zones. *See, e.g. Utah v. Babbitt*, 137 F.3d 1193, 1214 (10th Cir.1998) (plaintiffs had no standing under NEPA, but would have standing if the Defendants "decide to amend the land use plan").

 Plaintiffs also have not shown an injury in fact as to their claim that the GMP impinges on the rights of current leaseholders in the Park. None of the Plaintiffs have alleged themselves to be such leaseholders, so they do not have standing to pursue these claims. *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 ("stating that *the plaintiff* must have suffered an 'injury in fact' ")(emphasis added).

### 2. *Isle Royale National Park Act*

 Plaintiffs allege in paragraph 27 of their first amended complaint that NPS' possible future zoning of waters as nonmotorized zones violates the Isle Royale National Park Act, 16 U.S.C. §§ 408–408*l*. For the reasons stated above (relating to Plaintiffs' allegations that possible future nonmotorized zones violates the Wilderness Act), Plaintiffs do not have standing to pursue this claim.

### 3. *Root–Bryce Treaty*

Plaintiffs also allege in paragraph 27 of their complaint that the Root–Bryce Treaty, also known as the Boundary Waters Act, 36 Stat. 2449, is violated by the possible future creation of nonmotorized zones. For the reasons already stated, Plaintiffs do not have standing to raise this claim at this time.

### 4. *Isle Royale Wilderness Act*

 Plaintiffs allege that the NPS has violated the Isle Royale Wilderness Act, Pub.L.No. 94–567, 90 Stat. 2692 (1976). They point to the following language in the legislative history in support of this claim: "The Committee understands that no significant expansion of boat docks numbers [sic] is anticipated, but that continued maintenance of these facilities is essential to the continued ease of access as well as the health and safety of the visitors." S.Rep. No. 94–1357, at 5 (1976). Plaintiffs claim that NPS has failed to maintain docks properly and that the proposed implementation of NPS's plan to remove four docks and add six new docks violates the Isle Royale Wilderness Act, as evidenced by the quoted language from the legislative history. They also allege that this act

is violated because docks in Hugginin Cove and Hay Bay, which were usable in 1976, have either been allowed to deteriorate so as to be unusable, or have been removed,[3] and because NPS has taken over docks formerly used by the public in Rock Harbor and designated them as being for NPS use only.

 NPS' decisions as to dock locations under the GMP cannot be deemed contrary to the Isle Royale Wilderness Act. As has been mentioned, NPS maintains discretion to manage Isle Royale, and this discretion includes the ability to manage Isle Royale's waters. Whether or not this Court agrees with the proposed placement is not the issue; rather, the issue is whether the proposed placements violate statutory language or are arbitrary and capricious. Under the GMP, Plaintiffs will have access to two more docks than they have current access to. There is no indication in the record that the total amount of dock space will be any less under the GMP than the total amount of dock space currently available.[4] While Plaintiffs may not agree with the placement of the new docks, this matter is firmly within the NPS' discretion under the relevant statutes. The fact that Plaintiffs will have more docks available shows that their "ease of access" to the Park is not being

hampered by the proposed dock demolition and construction under the GMP.

 Regarding the maintenance issue, Plaintiffs have submitted a letter from Isle Royale's superintendent, Douglas A. Barnard, to John C. Ylitalo, a member of "the first group of concerned boaters that I [Barnard] met with . . . ." (Letter from Barnard to Ylitalo of 5/8/97 at 1.) This letter was not submitted to this Court as part of the administrative record. The administrative record in a case "includes all materials compiled by the agency[ ] that were before the agency at the time the decision was made." *Slater*, 120 F.3d at 638 (citations and internal quotation marks omitted) (alteration in original). "Several reasons justify supplementation of the administrative record, such as when an agency deliberately or negligently excludes certain documents . . . ." *Id.* In the case at hand, the letter from Barnard to Ylitalo was certainly "before the agency at the time the decision was made"; it was written on May 8, 1997, and the GMP was issued on August 17, 1998. This document will therefore be admitted to supplement the administrative record, because it was either deliberately or negligently excluded from the record and its consideration helps

---

**3.** Plaintiffs also claim at page 16 of their memorandum in support of summary judgment that the removal of the Siskiwit dock is based at least in part on deterioration. (Pls.' Mem. Supp. Mot. for Summ. J. at 16.) Plaintiffs have not pointed this Court to any evidence in the administrative record (or elsewhere) that docks used to exist at Hugginin Cove and Hay Bay but that they deteriorated so as to be unusable. They cite page 37 of the GMP in support of their allegation that the Siskiwit Bay dock is proposed to be removed at least in part on maintenance considerations, but a review of that page reveals no support for this contention. (GMP at 37.) As will be explained, Plaintiffs' failure to cite to any evidence in the administrative record (or even elsewhere outside of the administrative

record) means that summary judgment on this issue is proper for Defendants.

**4.** Page 142 of the GMP states that "[d]ock length will be consistent with the historic scene. Longer docks outside of developed areas will not be considered, as they may result in crowding and associated noise and reduce opportunities for solitude." *Id.* At this time, this statement is too vague to allow Plaintiff to succeed with a claim that the GMP unreasonably restricts boater access to the island by impermissibly reducing available dock space through replacing existing docks with smaller dock. It does not currently present this Court with a "concrete and particularized" dispute. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

the full and accurate resolution of this case.

In this letter, Barnard admits that "[w]e have not been able to devote funding to the docks, all of which are deteriorating rapidly and need extensive repair." (Letter from Barnard to Ylitalo at 2.) NPS has an obligation under the language contained in the legislative history of the Isle Royale Wilderness Act to maintain the docks at the Park. It appears that they may not be meeting their obligations in this respect. On the other hand, Plaintiffs have cited no evidence in the record showing that any docks have been allowed to deteriorate so as to be unusable. Furthermore, Plaintiffs have cited no evidence in the record which shows that NPS' failure to maintain the docks has had any effect on Plaintiffs. Even assuming that every dock on the island is in need of maintenance, if Plaintiffs cannot show that they have suffered some concrete harm as a result they do not have standing under *Lujan.*

■■■■ The only concrete injuries Plaintiffs allege due to a lack of maintenance on the docks is that two docks have become unusable and the dock at Siskiwit Bay has been slated to be demolished. Plaintiffs' lack of demonstration of any evidence in the administrative record on these points means that summary judgment is proper for defendants. " '[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.' " *Florida Power & Light, Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Id.* at 743–44, 105 S.Ct. at 1607. Therefore, while a

court may allow supplementation of the administrative record, *see Slater,* 120 F.3d at 638, such supplementation should be limited. *Id.*

■■■■ In light of the fact that "the focal point for judicial review should be the administrative record already in existence", *Florida Power & Light,* 470 U.S. at 743, 105 S.Ct. at 1607, and that Plaintiffs have cited no facts in the administrative record in support of their contention that three docks have been affected or will be potentially affected in one way or another due to a lack of maintenance, summary judgment against them is proper. While Rule 56(c) provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," *id.,*

> [i]n cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (1986). To put it succinctly, in a case requesting review of agency action under the APA, a party challenging the action as arbitrary and capricious may not withstand a summary judgment motion by the government without citing to the adminis-

trative record, or, possibly, some evidence outside of the administrative record, on the relevant point.[5] Because Plaintiffs have not done so, summary judgment against them on this point is warranted.

 Even if Plaintiffs identified evidence outside the administrative record regarding these contentions, this Court believes that two docks becoming unusable due to lack of maintenance, and one's lack of maintenance factoring into a decision to replace that dock, does not rise to the level of violating the requirements of the Isle Royale Wilderness Act. That act contemplates the continued maintenance of docks at the Park; it does not contemplate the continued maintenance and existence to perpetuity of *every* dock *currently* at the Park. Plaintiffs' counsel conceded as much in oral argument.[6] Thus, even if Plaintiffs did have standing to sue as to a lack of maintenance ·on all the docks, the only effects they have alleged to result from this lack of maintenance do not rise to the level of violating the Isle Royale Wilderness Act. It is true that NPS noted that "[a]ll four docks proposed for removal ... would have to be replaced within the life of the plan," (GMP at 141); but the life of the plan is "at least the next 15—20 years." (GMP at v.) In addition, NPS itself "agrees that the need to repair or replace facilities does not, in and of itself, justify changing the park's infrastructure." (GMP at 161.) Therefore, NPS stated that maintenance considerations were not the primary considerations in replacing the four docks they propose replacing, and Plaintiffs have pointed to no evidence in the record to refute this claim. Indeed, replacement of the four docks at issue with the six proposed docks is perfectly consistent with NPS' desire to separate uses in the Park and "meet the diverse expectations and needs of Isle Royale visitors." (GMP at 34.)

Plaintiffs also allege that NPS taking over docks in Rock Harbor and designating them solely for NPS use violates the Isle Royale Wilderness Act. Again, they have pointed to no evidence in the administrative record as to this claim, so summary judgment on this point is appropriate. It seems highly doubtful that NPS closed enough docks in this area to impede substantially on the right of boaters to access the Park.

 Plaintiffs are entitled to an examination of the legislative history of the Isle Royale Wilderness Act. "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Def. Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "If [the agency's] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute *or its legislative history,* that the accommodation is not one that Congress would have sanctioned." *Id.* at 845, 104 S.Ct. at 2783 (internal quotation marks and citation omitted, emphasis added). "[E]ven the most basic general principles

---

**5.** The Court is not unaware that some courts do not use summary judgment proceedings in reviewing agency action under the APA. *See Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1579–80 (10th Cir.1994). However, the Sixth Circuit has not so held. *See Alexander v. Merit Systems Protection Board,* 165 F.3d 474, 480–81 (6th Cir.1999). In any case, even were the Sixth Circuit to so hold, there is no reason that a rule analogous to the summary judgment rule as explained in *Celotex* would not be appropriate in such a context.

**6.** See the further discussion of the legislative history language *infra.*

of statutory construction must yield to clear contrary evidence of legislative intent. Accordingly, we turn to the legislative history of [the relevant act]." *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (citation omitted). *But see Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 417, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992) ("If the agency interpretation is not in conflict with the plain language of the statute, deference is due") (citing *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 292, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988)).

 "As in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve." *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 118, 103 S.Ct. 986, 995, 74 L.Ed.2d 845 (1983) (internal quotation marks and citation omitted, alteration in original). Keeping in mind that specific statutory language controls general language, *FDIC v. Bates,* 42 F.3d 369, 372 (6th Cir.1994), it appears that the purposes Congress sought to serve are best achieved by construing the legislative history to guarantee boaters sufficient access to docks at the Park to assure their ease of access and safety, while not requiring NPS to maintain all existing docks in their existing locations. In making Isle Royale a part of the National Wilderness system, Congress made the Park part of

an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been af-

fected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; [and] (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation . . . .

16 U.S.C. § 1131(c). Congress also made Isle Royale into an area "administered by the Secretary of the Interior in accordance with the applicable provisions of the Wilderness Act." P.L. 94–567, 90 Stat. 2692 § 6. NPS is proposing to change the location of a number of docks, not to eliminate docks without replacing them. One of its primary objectives in doing so is to separate uses, that is, to ensure that the park "has outstanding opportunities for solitude or a primitive and unconfined type of recreation." 16 U.S.C. § 1131(c). It is also attempting to protect the wilderness resource and to administer Isle Royale "for the use and enjoyment of the American people in such manner as will leave [it] unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas [and] the preservation of their wilderness character." 16 U.S.C. § 1131(a). Were NPS proposing to eliminate and replace all current docks, the language of the legislative history might be implicated. Similarly, the language of the statute might be implicated if NPS was proposing a large reduction in the amount of available dock space. But that is not the situation presented in this case. Instead, NPS has proposed changing the locations of four docks, and adding two additional docks, with no indications in the record that this will result in drastically fewer docking opportunities for boaters.[7] In these circumstances, and in light of the purposes of Congress in classifying Isle Royale as a wilderness, this Court cannot

---

**7.** The claims in the Bieti affidavit regarding a large reduction in dock space under the GMP are based only on docks with campgrounds

and erroneously assume that NPS is not committed to placing any new docks under the GMP. (Bieti Aff. at 8, *Id.* at Ex. 1).

say that NPS' proposed actions violate the Isle Royale Wilderness Act.[8]

### 5. *National Park Service Organic Act and Isle Royale National Park Act*

Plaintiffs state that both the NPSOA and the IRNPA mandate that NPS balance the goals of use and enjoyment and of resource protection. They claim that the GMP emphasizes resource protection at the expense of visitor use and enjoyment, and that it therefore violates these acts.

The GMP, however, does not emphasize resource protection over visitor use and enjoyment. For one thing, there will be more docks after the GMP than existed before. As to the location of the docks, these are based mostly on the Park's zoning, which is meant to establish a separation of uses. (GMP at 34 ("Docks would be removed from a few campgrounds to reduce noise and better meet the expectations of hikers and paddlers in these areas. Similarly, several new campgrounds with docks for motorboaters and paddlers are proposed in areas that are not accessible by trail. Docks would not be removed until the new docks in the vicinity were available for public use").) The establishment of quiet/no-wake water zones is based equally on the goals of "reduc[ing]

noise and wake impacts." (*Id.*) Again, this action is not based primarily on protecting resources, but, instead, on the goals of reducing wake impacts, and reducing noise to meet the expectations of hikers and paddlers. The same is true as regards the GMP's restrictions upon on-board generator use by motorboaters, as well as other actions taken to maintain quiet in the Park. These actions, and others like them that may be proposed in the future, are meant "[t]o protect the natural quiet and wilderness values sought by most visitors." (*Id.*) Removal of the Indian Portage Trail would be undertaken to "relieve use pressure in the area, separate uses, and protect archeological resources." (*Id.* at 36.) Here again, separating uses is one of the goals meant to be achieved; elimination of the trail is not simply based on environmental concerns. Removal of the dock and breakwater at Siskiwit Bay is explained on page 37 of the GMP as permitting separation of uses and allowing reestablishment of the natural current along the shoreline. It seems likely that removal of the breakwater does not contribute to separation of uses. Removal of the breakwater, however, if based solely on environmental concerns, does not mean that the GMP as a whole emphasizes resource protection over use and enjoyment. NPS is charged with protecting the resources in

---

8. Defendants have mentioned other legislative history language. The Senate Committee noted that "[i]n striking the special management language from the House passed bill, the following provisions relating to Isle Royale were deleted: (1) the construction and maintenance of boat docks along the lakeshore as long as their purpose is for safety of visitors and the protection of the wilderness resource ...." S.Rep. No. 94–1357, at 5 (1976). The Committee then noted that "[t]his technical decision should have no effect on the continuance of those activities pursuant to the appropriate provisions of the Wilderness Act." *Id.*, NPS argues that this language shows that the maintenance of docks is left to its discretion.

As has already been mentioned, however, in interpreting legislative pronouncements, the specific trumps the general. Here, the Senate Committee explicitly stated that "continued maintenance of these facilities [boat docks] is essential to the continued ease of access as well as the health and safety of visitors." While the Court does not believe this language requires perpetual maintenance of every dock that existed at the time of enactment of the Isle Royale Wilderness Act, it is equally clear that under this language NPS does not have the discretion to refuse to maintain, in the aggregate, the docks that existed at the time of enactment of the Isle Royale Wilderness Act.

the Park. Taking an action such as removing a breakwater is consistent with its mandate to protect the Park's resources and does not unduly interfere with the use and enjoyment of the Park. The question is not whether NPS has acted exclusively or primarily based on environmental concerns as regards any one particular action, but instead, whether the GMP unduly emphasizes environmental considerations at the expense of the considerations of use and enjoyment of the park. (1st Am. Compl. ¶ 31 (alleging that "the GMP emphasizes additional resource protection, which is unsubstantiated, at the expense of visitor use and enjoyment of the resource").) While not every NPS action equally emphasizes these two goals, the facts mentioned above show that as a whole, the proposed action equally emphasizes use and enjoyment and resource protection. (GMP at 34 ("The goal of the proposed action ... is to meet the diverse expectations and needs of Isle Royale visitors while emphasizing the natural quiet that is fundamental to wilderness experiences. All park areas would be available to all visitors, so long as users participate in ways that are consistent with the access, facilities, and opportunities provided."))

### 6. *NEPA*

In Count IV of their First Amended Complaint, Plaintiffs allege that the GMP violates the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 to 4370e. The purposes of NEPA are to

declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321. NEPA is procedural in nature and does not require that government agencies achieve any particular substantive environmental results; rather, "it compels agencies to collect and disseminate information about the environmental consequences of proposed actions that fall under their respective jurisdictions." *Southwest Williamson Community Ass'n, Inc. v. Slater,* 243 F.3d 270, 278 (6th Cir. 2001). "[B]y focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 346, 349, 109 S.Ct. 1835, 1845 (1989). Thus, NEPA requires federal agencies to take a "hard look" at the environmental impact of proposed major actions. *Id.* at 350, 109 S.Ct. at 1846. The statute requires, to the fullest extent possible, that all federal agencies prepare an Environmental Impact Statement ("EIS") before undertaking major actions. The statute directs officials to:

[I]nclude in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment

and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). There is no dispute that the development of an updated management plan is a major federal action, thus making NEPA applicable in this case.

The regulations implementing NEPA prescribe the information required to be included in an EIS. 40 C.F.R. § 1502.2 states:

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

40 C.F.R. § 1502.2. With regard to the presentation of the proposed action and alternatives, the regulations provide that agencies should:

present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.

Plaintiffs contend that the GMP, which also serves as the EIS, violates NEPA and

the implementing regulations issued by the Council on Environmental Quality in several respects.

### a. *Rigorous Analysis*

Plaintiffs contend that the GMP/EIS fails to comply with NEPA because Defendants did not conduct a rigorous analysis of any of the alternatives, including Alternative A, the no action alternative. Among other things, Plaintiffs point out that in the "Impacts On Natural Resources" section for the no action alternative, the GMP asserts that "waterfowl would continue to be disturbed at their nesting sites" and "[t]his impact could increase with uncontrolled motorboat use", (GMP at 113), without any support in the GMP for those conclusions. In addition, Plaintiffs note that Defendants failed to conduct surveys or studies of the current management plan to serve as a basis for comparing the alternatives with the current plan.

 A court's determination of whether an EIS complies with NEPA's requirements is limited to determining whether: (1) the EIS discusses each of the five issues set forth in 42 U.S.C. § 4332(C); (2) the EIS demonstrates good faith compliance with NEPA by the agency; and (3) the EIS contains a reasonable discussion of the five issues with respect to the particular subject. *See Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 n. 9 (10th Cir.1992)(quoting *Johnston v. Davis*, 698 F.2d 1088, 1091 (10th Cir.1983)). In other words, a court should make "'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision making and informed public participation.'" *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1183 (9th Cir.1997)(quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir.1988)).

 Having reviewed the GMP and, in particular, the "Environmental Consequences" discussion for the no action plan and the alternatives, the Court concludes that Defendants' analysis of the environmental impact of all management plans, including the no action plan, is sufficient to allow both informed decision making and informed public participation about whether changes to current management practices are necessary and/or desirable for the preservation of the Park's resources and to permit a reasoned choice among the alternatives in light of the environmental aspects of each alternative. The crux of Plaintiffs' argument is not that Defendants failed to conduct *any* analysis (because, as Defendants point out, the GMP contains an environmental analysis section for all alternatives), but rather that the analysis is too brief. However, neither NEPA nor the CEQ's regulations prescribe a minimum page length for discussion of alternatives. Rather, an EIS "need only be sufficient to serve as a basis for consideration of the environmental impacts of the various reasonably feasible alternatives available." *Farmland Pres. Ass'n v. Adams*, 491 F.Supp. 601, 609 (N.D.Iowa 1979)(citing *Iowa Citizens For Envtl. Quality, Inc. v. Volpe*, 487 F.2d 849, 851 (8th Cir.1973)), *aff'd* 611 F.2d 233 (8th Cir.1979). Moreover, as discussed more fully below, because the GMP is a programmatic rather than site-specific document, it is expected to contain a less-detailed analysis than might otherwise be the case when a specific project is under consideration. In fact, this is the intended nature of GMPs:

> GMPs are now defined as conceptual plans that focus on what conditions should be achieved and maintained in parks—with little or no detail about specific actions. Decisions made through a GMP have the potential to affect a park's resources and values on a broad

scale, and they are even more likely than smaller-scale implementation plans to have significant long-term impacts and to qualify as major federal actions. These GMPs/EISs are ideal places to discuss ecosystem sustainability and management, biodiversity, community or regional land use planning, and other larger scale issues. These are the kinds of decisions CEQ believed would benefit from EISs and their comprehensive environmental planning and public involvement efforts. Furthermore, courts have been consistent in requiring EISs for large-scale agency decision making. When a large-scale plan such as a GMP is prepared, the information can and should be less detailed than the site-specific information required in an implementation plan. In most GMPs it will be difficult to conduct the traditional impact analysis where the focus is on quantifiable impacts (the amount of acreage disturbed or the number of archeological sites affected) because of the conceptual nature of the plan. Subsequent implementation proposals are "tiered" (procedurally connected) to the broadscale GMP/EIS. Tiering allows the Park Service to "focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe."

NPS Planner's Sourcebook, Director's Ord. # 2, at 9–2, *http://www.nps.gov/planning/do2/page1.htm.* (quoting 40 C.F.R. § 1508.28).

Even though it is general in nature, the GMP does address impact topics for each alternative. For example, under the section "Impacts On Natural Resources," the GMP contains brief discussions on how the current management plan would affect wildlife, threatened and endangered species, designated wilderness areas, geologic processes, and water quality. Similarly, under the section "Impacts On Visitor Use And Visitor Experiences," the topics of scenic quality, wilderness experience and noise, range of uses, and safety are discussed.

■ With regard to the no action alternative, Plaintiffs assert that the analysis is shallow and unsupported because there is no proof that waterfowl are disturbed in their nesting sites by uncontrolled boat usage. However, an EIS "may rely upon external materials provided that the materials are reasonably available, that statements in the Final Statement are understandable without undue cross-reference, and that incorporation by reference meets a general standard of reasonableness." *Ohio Valley Trail Riders v. Worthington,* 111 F.Supp.2d 878, 884 (E.D.Ky.2000)(citing *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 496 (9th Cir.1987)). In response to a comment received about increasing the protection of loons and other waterbirds by increasing nonmotorized zones for boats, Defendants stated:

> Input from biologists who have worked with Isle Royale waterbirds was sought by the planning team throughout the planning process. Their recommendations to protect such species were incorporated into the proposed action (as revised); the biologists have commented that the quiet/no-wake zones in the plan do a good job of minimizing impacts to waterbirds such as loons, while still providing safe harbor and permitting motorboat use in Lake Superior waters of the park. Evidence that loon nests can be affected by boat wakes is based on nest observations; these effects are not specific to Pickerel Cove.

(GMP at 156–57.) Documentation supporting this response is contained in the administrative record. (*e.g.,* A.R. at 1631–58, 1899–1903, 11596–97.) Thus, the record adequately supports Defendants' statements regarding the effects of motorized boats on waterbirds found in the Park.

Similarly, Plaintiffs' assertion that Defendants failed to conduct surveys or studies of current management practices to provide a baseline for evaluating needed changes ignores statements in the GMP and ample evidence in the administrative record indicating that Defendants received information and feedback on current management practices from written visitor comments and public meetings. Finally Plaintiffs' reference to the statement about the impact of the Rock Harbor motels does nothing to undermine the sufficiency of the analysis. The point of that statement is that the appearance of the motel units is inconsistent with the surrounding environment.

Plaintiffs also claim that the analysis of the proposed action is inadequate because it does not address the congestion that will be caused by removal of the docks and the breakwater, fails to consider that removal of the docks would reduce boaters' access to wilderness areas, and fails to address the effect removal of the docks and the breakwater would have on boater safety as a result. The Court rejects these arguments because these issues are addressed to some degree in the GMP. The GMP identifies two means for handling congestion of boat visitors: (1) through the construction of new docks, which may actually provide more docking space than presently exists; and (2) through monitoring and limitation of visitor use. (GMP at 117.) With regard to reduction of boaters' access to wilderness areas, the GMP notes that boaters will still have access to all areas of the Park open to other visitors, although they may have to hike or paddle to reach some areas previously directly accessible by boat. (*Id.* at 140–41.) Thus, although Plaintiffs' access by boat may be reduced, the scope of their access is no less than that of other visitors. Finally, the GMP notes that any reduction of boater safety arising from the removal of docks will be alleviated through construction of additional docks. (*Id.* at 142.)

■ Plaintiffs also contend that the GMP is deficient because there is no analysis of cumulative impacts. The CEQ regulations state:

> *Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (italics in original). In spite of Plaintiffs' assertion that there is no cumulative impact analysis, Plaintiffs must concede that the GMP includes a cumulative impacts analysis both under the section regarding impacts common to the proposed action and alternatives B, C, and E, and under the separate proposed action discussion. Plaintiffs' argument is that the analysis is too brief. However, Plaintiffs do not identify actions by other parties which Defendants should have considered in relation to the proposed alternative that would have a cumulative impact. While Plaintiffs do recite a number of issues which they contend should have been considered, those issues relate to the proposed action itself, not to the incremental impact of other actions.

### b. *Lack of Site–Specific Analysis*

■ Plaintiffs also contend that the GMP fails to comply with NEPA because it does not contain analysis of site-specific actions. In particular, Plaintiffs claim that the GMP should have examined the specific environmental impact of construction and removal of new docks. Defendants respond that site-specific analysis and data

was not required as part of preparation of the GMP because general management plans are intended to be long-range planning documents that provide a broad overview of the management plan. Defendants assert that the environmental impact of specific program actions will be analyzed in subsequent documents that "tier off" the more general GMP.

The CEQ regulations sanction the use of tiering in a programmatic EIS:

> Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review. Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement by reference and shall concentrate on the issues specific to the subsequent action....

40 C.F.R. § 1502.20; *see also* 40 C.F.R. § 1508.28. In *National Wildlife Federation v. Appalachian Regional Commission*, 677 F.2d 883 (D.C.Cir.1981), the court explained the differences between a programmatic and site-specific EIS:

> A programmatic EIS reflects the broad environmental consequences attendant upon a wide-ranging federal program. The thesis underlying programmatic EISs is that a systematic program is likely to generate disparate yet related impacts. This relationship is expressed in terms of "cumulation" of impacts or "synergy" among impacts that are caused by or associated with various aspects of one big Federal action. Where-

as the programmatic EIS looks ahead and assimilates "broad issues" relevant to one program design, the site-specific EIS addresses more particularized considerations arising once the overall program reaches the "second tier," or implementation stage of its development. In evaluating a comprehensive program design an agency administrator benefits from a programmatic EIS which indubitably "promote(s) better decisionmaking."

*Id.* at 888 (footnotes and citations omitted); *see also Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291, 1317 (W.D.Wash.1994)(stating that "[w]hen a programmatic EIS is involved ... site-specific impacts may be analyzed later").

The GMP indicates that it is intended to define a general plan for park management that will receive additional study and evaluation when its specific components are implemented. For example, on page 3, the GMP states: "General management plans usually provide guidance over a 15–20 year period. Actions called for in general management plans or in subsequent implementation plans are accomplished over time." Later, the GMP states, "this environmental impact statement is programmatic and presents an overview of potential impacts relating to each alternative. This environmental impact statement will serve as a basis for NEPA documents prepared to assess subsequent developments or management actions." (GMP at 107.) Because the GMP is intended to be a programmatic document rather than a site-specific document, the Court agrees with Defendants that site-specific analysis is not required.

The Court finds the cases cited by Plaintiffs in support of their claim that site-specific analysis should be performed now rather than later to be distinguishable from the facts in this case. In *Sierra Club*

v. *Marita,* 46 F.3d 606 (7th Cir.1995), the court rejected the Forest Service's argument that the plaintiffs lacked standing to raise a NEPA challenge because the forest management plans at issue were programmatic and therefore did not require or specify that any particular activity occur. The court held that the plaintiffs were not required to wait until specific projects were implemented to challenge the plan because if the plaintiffs "had to wait until the project level to address general procedural injuries regarding a broad issue like biological diversity, implementation of the forest plan might have progressed too far to permit proper redress." *Id.* at 612. The obvious distinction is that the issue in *Marita* was standing, not whether site-specific or project-level analysis was required in the EIS. Moreover, the plaintiffs in *Marita* were raising an issue that affected the overall plan rather than challenging the implementation of a specific action. Similarly, *Town of Huntington v. Marsh,* 859 F.2d 1134 (2d Cir.1988), does not support Plaintiffs' claim that it is improper for Defendants to defer an analysis of replacement facilities. The project in *Town of Huntington* was a dredging disposal site in Long Island Sound. In preparing an EIS for the project, the Army Corps of Engineers (the "Corp") defined the project as the designation of the disposal site. The court determined that the Corp's scope of the project was too narrow because issuance of dumping permits, which would require analysis of the types, quantities, and cumulative effects to be deposited at the disposal site, was an activity related to designation of the site and should have been analyzed as part of the overall project rather than on a case-by-case analysis. The court noted that the Corp's approach was merely a variant on "segmentation," a practice of piecemealing a particular action into component parts, which has been rejected by the courts. *See id.* at 1142. This case is far different from *Town of*

*Huntington* because that case did not involve a general management document suited to tiering, but instead involved a specific project with interrelated acts which could only be considered together in one single analysis.

 Plaintiffs contend that Defendants will fail to conduct site-specific analyses even though the GMP indicates site-specific analyses will be performed prior to the occurrence of the specific actions identified in the GMP. As support for their contention Plaintiffs point out that Defendants failed to conduct specific site analyses for implementation of the quiet/no-wake zone provision of the plan and the regulation banning use of on-board generators within one-quarter mile of certain designated campgrounds. The Court finds it questionable whether these actions even require a separate EIS because they are arguably "non-major action[s] or [ ] major action[s] which do[ ] not have a significant impact on the environment." *Sierra Club v. Hassell,* 636 F.2d 1095, 1097 (5th Cir. Unit B 1981). However, even if an EIS would be required for these actions, Defendants were not required to prepare a new EIS because the effects of those actions were already adequately considered in the GMP. *See Sharps v. United States Forest Serv.,* 823 F.Supp. 668, 677–78 (D.S.D.1993).

### c. *Failure to Prepare Supplemental EIS*

 Plaintiffs argue that Defendants violated NEPA by failing to prepare a supplemental EIS based upon changes to the GMP between the last draft and the final agency action. Plaintiffs contend that a supplemental EIS was required because the plan was revised to greatly expand quiet/no-wake zones and language was inserted indicating that nonmotorized zones would be used if quiet/no-wake zones failed

to achieve the desired goals. CEQ regulations provide that a supplemental EIS should be prepared if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i), (ii). An agency's decision regarding the need for a supplemental EIS will be upheld unless it is arbitrary and capricious. *See N. Crawfish Frog (Rana Areolata Circulosa) v. Fed. Highway Admin.*, 858 F.Supp. 1503, 1520 (D.Kan.1994).

The Court concludes that Defendants' decision not to prepare a supplemental EIS was not arbitrary and capricious because expansion of quiet/no-wake zones does not constitute a substantial change to the proposed action or new circumstances relevant to environmental concerns that were not adequately addressed in the GMP (the Court has already found that Plaintiffs do not have standing on the proposed nonmotorized zones). In other words, the environmental concerns relating to use of quiet/no-wake zones, i.e., reduction of excessive noise, decreased wake effects on shoreline resources, and reduced wake impacts on nonmotorized boaters, were considered in the GMP. These same concerns would also apply to the creation of nonmotorized zones if Plaintiffs had standing to challenge the EIS on this point. There is no indication that the changes cited by Plaintiffs presented any new concerns or created new environmental effects not addressed in the original draft.

#### d. *Failure to Disclose Critical Documents*

 Plaintiffs also claim that Defendants violated NEPA by failing to disclose documents that were pertinent to the administrative process. In particular, Plaintiffs claim that Defendants failed to disclose pages of legislative history during the EIS preparation and hearing process which, Plaintiffs assert, demonstrate Congress's intent that the docks be maintained for use by boaters. Plaintiffs assert that had this information been disclosed, Plaintiffs and others could have used it for their written and oral presentations regarding the alternative plans. While it is true that NEPA is an environmental "full disclosure" law designed to ensure that the public has access to information relating to a project's environmental costs, *see Minn. Pub. Interest Research Group v. Butz*, 541 F.2d 1292, 1299–1300 (8th Cir.1976), Plaintiffs have not cited any authority to support their claim that an agency's failure to disclose legislative history of a statute relevant to an environmental analysis violates NEPA. As Defendants correctly note, legislative history is a matter of public record, and is therefore available to the public outside of the EIS process. Moreover, as discussed above, the legislative history was not relevant to the EIS process because it did not create any substantive rights for boaters with respect to the size or number of docks and campgrounds. Finally, even if Defendants were required by NEPA to disclose legislative history, the administrative record shows that Plaintiffs had access to the legislative history and were able to use that history in support of their comments submitted during preparation of the GMP. (GMP at 142; AR at 12395.)

#### e. *Lack of Accuracy and Integrity*

 Plaintiffs also contend that the GMP violates the requirement in 40 C.F.R. § 1502.24 that "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." Plaintiffs cite several examples which they claim show that Defendants improperly manipulated or ignored certain information

and relied on other information that was false and misleading.

Plaintiffs contend that Defendants misled the public about the nature of comments received by stating that many people indicated they could live with the proposed plan and that most comments expressed support for motorized sensitive zones. Plaintiffs also point out that in selecting the preferred alternative, Defendants ignored the fact that more of the public was in favor of the no action alternative. The Court finds neither of these points persuasive. First, while Plaintiffs and Defendants characterize the public comments and complaints about motorboat usage differently, the Court finds nothing misleading about Defendants' characterizations in the GMP. Although the Court did not review each and every comment and complaint, it is satisfied based upon comments it did review that many (although perhaps not a majority) of those who submitted comments were in favor of restrictions on motorboat usage, and several suggested that the restrictions be greatly increased or even that motorboats be banned entirely from the Park. Second, Plaintiffs have cited no provision of NEPA or any other law requiring NPS to adopt the alternative chosen by the majority of Park users, or by a majority, organized or unorganized, of those who send public comments.

■ Next, Plaintiffs contend that the GMP violates NEPA because Defendants used false and misleading visitor information to support their choice of the preferred alternative. Plaintiffs support this argument with the affidavit of John E. Kappler. Based on its review of Kappler's affidavit as well as the documents in the administrative record cited by Kappler, the Court agrees with Plaintiffs that the reliability and accuracy of the visitor counts used by Defendants are questiona-

ble. For example, the reports for December 1995, 1996, and 1997, show a large number of private boats and visitors in the Park when, in all likelihood given the location of the Park (in the middle of Lake Superior) and the time of year (December), no visitor or private boat went to the Park. (Kappler Aff. ¶ 7 and ¶ 12 at 14, 20–21, 33.) Kappler also points out that for some unexplained reason, data is sometimes changed from previous reports, usually to reflect a higher number of visitors. (*Id.* ¶¶ 5, 6, ¶ 12 at 10, 11.) In addition, Kappler notes that the computer system used by the NPS lacks internal controls for accurately accumulating and carrying forward year-to-date figures. (*Id.* ¶ 12 at 10.)

In spite of the deficiencies pointed out in the Kappler affidavit, the Court concludes that they are not so substantial as to undermine the basic integrity of the information in the GMP. For example, Kappler states that the correct visitor figure for 1993 should be 16,996 rather than 16,625 as reported in the GMP (an understatement of 371) and that the correct visitor figure for 1994 should be 18,241 rather than 18,725 as reported in the GMP (an overstatement of 484). (*Id.* at 12–13.) Kappler also states that the visitor figures for 1995 through 1997 were "reasonably" or "somewhat" accurate. (*Id.* at 14, 22, 24.) Moreover, the information presented in the Kappler affidavit does not undermine a basic premise of the GMP, namely, that there has been a long-term trend of increasing visitors and motorboat usage in the Park, despite short-term fluctuations from year-to-year.

■ Finally, Plaintiffs contend that conclusions in a study performed by an independent contractor regarding the economic feasibility of facilities at Rock Harbor that were used by Defendants in preparing the GMP were based upon an

inflated figure for infrastructure repair which Defendants furnished to the independent contractor. In 1996, NPS contracted U.P. Engineers & Architects, Inc. ("U.P. Engineers") to perform a safety assessment to assess the necessity and costs of improvements to bring the facilities at Rock Harbor into compliance with public health codes and regulations. In a report issued in December of 1996, U.P. Engineers determined that the costs of upgrading the infrastructure of the Rock Harbor facilities was approximately $3.4 million. In its report, U.P. Engineers indicated that approximately $1 million of the $3.4 million was for electrical system changes not based upon code violations (in other words, the improvements were not necessary). Subsequently, NPS retained Dornbusch & Company ("Dornbusch") to perform an economic feasibility study of the Rock Harbor facilities. NPS gave Dornbusch the $3.4 million figure for infrastructure repair from the U.P. Engineers report to use in the feasibility study, even though Park Facilities Manager Jed Davis had issued a written report in May of 1996 estimating a lower figure of $1.6 million for infrastructure repair and upgrades. According to Plaintiffs, Defendants subsequently admitted that the $3.4 million figure was inaccurate and inflated. Plaintiffs contend that Defendants should have obtained a revised study from Dornbusch based on the lower infrastructure repair figure (apparently either the figure from the Davis report or the figure in the U.P. Engineers report less the $1 million in unnecessary repairs identified in the U.P. Engineers report) and should not have used the Dornbusch study results to support their conclusions in the GMP.

The Court rejects Plaintiffs' contention that Defendants' use of the $3.4 million figure was improper or required amendment of the Dornbusch study or the GMP. The information supplied to Dornbusch was taken from the report issued by U.P. Engineers, an independent party. There is no suggestion in the record that Defendants somehow controlled the results of the U.P. Engineers report or influenced that firm to reach a preordained result. Because that information was the best information available to NPS at the time it engaged Dornbusch to perform the feasibility study, Defendants were entitled to rely upon it. Although Defendants ultimately concluded that the cost of the infrastructure improvements was actually lower than the $3.4 million figure, revision of the Dornbusch plan was unnecessary because the GMP was revised to reflect a minimum of $2.1 million for utility and infrastructure repair. (GMP at 56, 89.) Although the GMP did not adopt Jed Davis' $1.6 million figure, it does reflect a significantly lower minimum figure.

### 7. *Rehabilitation Act and the Americans with Disabilities Act*

■ Plaintiffs allege that NPS has violated the Rehabilitation Act and the Americans with Disabilities Act by removal of four docks and four shelters. As to the Rehabilitation Act claim, Plaintiffs must exhaust their administrative remedies before bringing such a claim. *Mickulicz v. Garthwaite*, No. 99–4166, 2000 WL 1234326, at * 1 (6th Cir. Aug. 22, 2000) ("Claims brought under the Rehabilitation Act, like claims brought under Title VII, require exhaustion of administrative remedies")(citing *Smith v. United States Postal Serv.*, 742 F.2d 257, 258–62 (6th Cir.1984)). Plaintiffs have not pointed to any statute or regulation suggesting that exhaustion is required only when plaintiffs seek monetary damages.

■ Even if Plaintiffs were not required to exhaust administrative remedies, Plaintiffs' Rehabilitation Act claim would

fail. 43 C.F.R. § 17.550(a)(1) provides that

(a) *General.* The [Department of Interior] shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by handicapped persons. This paragraph does not—

(1) Necessarily require the agency to make each of its existing facilities or every part of a facility accessible to and usable by handicapped persons.

*Id.* NPS' actions do not, on the whole, prevent the Park from being readily accessible to and usable by handicapped persons. More docks will be available after the implementation of NPS's plan than were available before it. It is true that there will be 18 fewer shelters readily accessible by dock. However, 70 shelters will remain so accessible. Furthermore, campers—even handicapped campers—are not, of course, limited to camping in shelters. With 70 shelters readily accessible by boat dock (and 14 others also potentially accessible to the handicapped, depending on their handicap), the Park will remain, as a whole, readily accessible to the handicapped.

■ As to Plaintiffs' ADA claim, the only plausible section of the ADA under which this claim can be made under is 42 U.S.C. § 12132. This section provides that "[s]ubject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* However, 42 U.S.C. § 12131 provides: "As used in this title: (1) Public entity. The term 'public entity' means—(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National

Railroad Passenger Corporation, and any commuter authority ...." *Id.* Noticeably absent from this definition is any mention of any agency or department of the federal government, other than the National Railroad Passenger Corporation. In sum, Plaintiffs may not sue NPS, a unit of the federal government, for discrimination under the ADA. Plaintiffs have pointed to no case in which such a suit has been allowed against a unit of the United States government.

## C. *Arbitrary and Capricious Acts*

■ Plaintiffs allege that the following actions are arbitrary and capricious in violation of the APA:

(a) the removal of docks at various places around Isle Royale;

(b) the removal of the breakwater at Siskiwit Bay;

(c) designation of numerous quiet/no-wake zones;

(d) failure of Defendants to consider reasonable offers by Plaintiffs to volunteer in the repair and maintenance of certain docks scheduled to be demolished by Defendants;

(e) discriminatory actions against Isle Royale visitors who use boats to enjoy the park;

(f) failure to follow the public interest as expressed by the clear majority of persons participating in the GMP process;

(g) the final designation of quiet/no-wake zones is not justified in the record;

(h) references to the desired reduction of noise as regards quiet/no-wake zones do not define "noise" (this is also claimed to violate Plaintiffs' Fifth Amendment right to due process), and boaters are already responsible for their own wakes;

(i) only vague references to solitude or noise are made to justify restrictions on the on-board use of generators;

(j) boater access to Isle Royale is being restricted without adequate reason and sacrificed to undefined "expectations" of hikers and paddlers;

(k) separation of uses and users is adopted by this final agency plan which is directly contrary to the concept of this plan as stated in the "Overall Concept" section on page 34 of the GMP;

(*l*) removal of four shelters will penalize boaters and hikers;

(m) destruction of the shelters and docks will leave a large segment of Isle Royale without adequate dock and camp facilities; and

(n) elimination of the Indian Portage Trail is not warranted.

Paragraphs (a), (c), (*l*), and (n) have already been adequately addressed, and the Court need not repeat its holdings as to those points.

■ Paragraph (b) deals with the removal of the breakwater at Siskiwit Bay. The Court has already mentioned that NPS proposes this action in order to reestablish the natural current along the shoreline. Plaintiffs allege that this statement is not supported in the record. However, any college geology student or Great Lakes shoreline owner knows that breakwaters disrupt the flow of sediment along a shoreline. This is common knowledge, appropriate for judicial notice, and needs no further support in the record.

Paragraph (d) involves the alleged failure of Defendants to consider offers by Plaintiffs to volunteer to repair and maintain certain docks. This is another situation where Plaintiffs pointed to no evidence in the record in support of such a claim. Defendants themselves claim to have denied that such an offer was made at paragraph 18 of their answers to Plaintiff's interrogatories. In any event, whether or not Plaintiffs made such an offer, they have cited no evidence in the administrative record to that effect, and so do not carry their burden of proving that Defendants' acted arbitrarily and capriciously.

Paragraph (e) is a mere allegation of discrimination against Isle Royale boaters. Without further support offered for this assertion, it cannot be viewed as anything other than a general allegation covering conduct which is elsewhere specifically addressed by Plaintiffs.

Paragraph (f) asserts that Defendants failed to follow the public interest as expressed by the majority of persons participating in the GMP process. Defendants noted that "[s]ubstantial public support was shown for all of the alternatives", (GMP at 161), and this contention is supported by the administrative record. (AR 354–397; 9,146–9834; 11,750–11,790; 12,-684–13,602; 14,419–14798; 18490–19577.) Furthermore, NPS has discretion to manage the Park; it is not a democratic body, to be governed by the wishes of the majority of those who choose to participate in the public process.

■ Paragraph (g) asserts that Defendants' designated quiet/no-wake zones do not comport with their definition of these zones contained on page 33 of the GMP as being areas which are either (1) found "in sheltered Lake Superior harbors and bays where calm water and relative quiet are desirable for safety, resource, or visitor experience reasons" or (2) where "waterbirds nest or where there are visitor centers or campgrounds." (GMP at 33.) However, the GMP merely states that quiet/no-wake zones "could be" located in such places, not "must be." (*Id.*) Moreover, the GMP justifies quiet/no-wake zones by noting that these zones have been expanded from the draft GMP in order to accomplish the result of "decreased noise, decreased wake effects on shoreline re-

sources (including loon nests), and reduced wake impacts on canoers and kayakers." (*Id.* at 138; *see also id.* at 34, 137–41 (explaining generally the rationale of the proposed quiet/no-wake zones).) NPS' actions in this regard were not arbitrary and capricious.

Paragraph (h) asserts that as regards NPS' goal to "reduce noise and wake impacts" in implementing quiet/no-wake zones, "noise" and "wake impact" are not defined; that there is no proof that waterbirds have been adversely affected by boat wakes; and that there is no recognition that boaters are currently responsible for their own wake. As Defendants note, NPS is concerned with "the effect of noise on the park and wilderness experience of hikers", (Defs.' Br. Supp. Mot. for Summ. J. at 30), and it is therefore not irrational for it to aim to reduce noise based on the perceptions of Park visitors, rather than on any given "decibel" level. This does not put boaters at a disadvantage, or deny boaters fair warning of how loud they may be, or how much wake they can produce; they must be quiet enough that they do not disturb other visitors, and they should run their boats at speeds that produce no wake. This is in line with the conditions generally expected in wilderness areas, and is not an arbitrary standard. Plaintiffs' due process rights are not violated by use of these standards.

Plaintiffs also allege that Defendants have not established any benefit to waterbirds from establishing quiet/no-wake zones. This contention has already been discussed in the section of this Opinion regarding NEPA. As stated, NPS mentioned such a benefit at pages 156–57 of the GMP.

As to the contention that NPS has not recognized that boaters are already responsible for their own wakes, this contention impermissibly attempts to shift the burden of proving NPS' actions to be arbitrary and capricious from Plaintiffs to NPS. In fact, whether or not Plaintiffs are currently responsible for their own wakes, it is their burden to show that NPS' proposed quiet/no-wake zones are arbitrary in light of Plaintiffs' existing obligations. This Plaintiffs have not done, since they do nothing more than mention that boaters are currently responsible for their own wakes, without attempting to demonstrate how this means that the implementation of quiet/no-wake zones is arbitrary and capricious.

Paragraph (i) alleges that there is not a rational basis for restriction of on-board generator use in the park other than "vague references to solitude or noise." (1st Am.Compl.¶ 36(i).) As already discussed under paragraph (h), however, attempting to give some park visitors a quiet experience is a justifiable aim of NPS, and its references are not so "vague" as to preclude knowledge of their purpose or effect.

Paragraph (j) alleges that boater access to Isle Royale is being restricted without adequate reason and sacrificed to undefined expectations of hikers and paddlers. It is not clear that this paragraph alleges anything not alleged elsewhere by Plaintiffs; no specific action is cited. NPS' actions surrounding dock removal and replacement, park zoning, etc., have already been discussed. To the extent that this paragraph alleges that the expectation of hikers and paddlers are not well-defined, the Court notes those sections of the administrative record already cited as showing definite concern by hikers and others about noise levels on Isle Royale. (AR at 354–397; 9,146–9834; 11,750–11,790; 12,684–13,602; 14,419–14798; 18490–19577.)

Paragraph (k) alleges that the adoption of a plan which separates uses in the Park is contrary to the "Overall Concept" of the plan as expressed on page 34 of the GMP. On the contrary, the "Overall Concept" of

the Park is "to meet the diverse expectations and needs of Isle Royale visitors while emphasizing the natural quiet that is fundamental to wilderness experiences." (GMP at 34.) This overall concept is not somehow contradicted by any of the specific actions proposed by NPS in the GMP. Moreover, as already mentioned, Plaintiffs do not have standing to sue on this issue.

Paragraph (m) alleges that destruction of the shelters and docks will leave a large segment of Isle Royale without adequate dock and camp facilities. However, a decision as to these matters is largely within NPS' discretion. Furthermore, the action proposed in the GMP leaves the Park with two more docks than it currently has, and only four shelters out of 88 are being destroyed. Additionally, in areas where docks are being taken out, replacement docks are generally being put back in the vicinity of the original dock—at the most, approximately 5 miles away—or existing docks are already in the vicinity of the docks to be removed. In the case of the Siskiwit dock, the replacement dock appears to be approximately five miles away. This is not, however, sufficient to prove that NPS has acted arbitrarily and capriciously in selecting where to put replacement docks. In light of the distances that boaters must travel to get to Isle Royale from the mainland in the first place, the fact that they have no substantive right to access all areas of the park, and the fact that they, like anyone else, are free to reach all those areas of the island open to the public in ways other than by motorboat, NPS' actions regarding replacement docks (and removal of four shelters) do not violate Plaintiffs' rights, and are not arbitrary and capricious.

Plaintiffs also allege that Defendants violated the APA by acting arbitrarily and capriciously through (1) erroneous calculation of utilities and construction costs leading to excessive surcharges to park visitors; (2) presenting erroneous park visitation trends and projections to justify the GMP; (3) relying on inaccurate annual visitor data; (4) adopting the GMP without determining the "carrying capacity" of Isle Royale.

Plaintiffs allege that NPS erroneously calculated the costs of utilities and construction, and that this led to excessive surcharges to Park visitors. In their memorandum in support of their motion for summary judgment, Plaintiffs allege that in Fiscal Year 1997, Defendants overcharged National Park Concessions, and that this overcharge in turn led to an overcharge to consumers in the form of surcharges to park visitors. (Pls.' Mem. Supp. Mot. Summ. J. at 12–13; 1st Am. Compl. at 22.) However, as NPS points out, NPS did in fact take this overcharge into account in Fiscal Year 1998, thereby reducing the 1998 surcharge to 18%, from what it otherwise would have been, namely, 26%. (AR at 12460.) NPS corrected its error and, therefore, did not act arbitrarily and capriciously on this matter.[9]

9. The allegation mentioned above is the only specific allegation made by Plaintiffs relating to excess surcharges incurred by park visitors. The Bieti affidavit argues that several studies regarding utilities issues are incorrect. However, Plaintiffs have not alleged that any of these studies resulted in higher pass-through costs to park visitors, and their allegation in the Complaint is limited to such claims. These studies, therefore, relate to Plaintiffs' claims under NEPA, and not under the part of Count VII currently under discussion. Plaintiffs stated as much in their Response to Defendants' Motion to Strike Affidavits: "The entire thrust of their [Messrs. Bieti and Kappler] information goes to the NEPA issue of scientific accuracy and professional integrity mandated by 40 C.F.R. § 1502.24...." (*Id.* at 1). Even if they did relate to Plaintiffs current Count, as discussed in the section of this Opinion regarding NEPA, NPS did not use the results of these studies in an unlawful manner in implementing the GMP.

Plaintiffs allege that NPS presented erroneous Park visitation trends and projections and relied on inaccurate annual visitor data as regards the GMP. This allegation has already been discussed in the section of this Opinion regarding NEPA compliance. In brief, while Plaintiffs have made a plausible showing that some of the numbers used by NPS to make future projections may have contained some inaccuracies (and the Court stresses the word "may", for it is not clear that NPS could not explain away differences), they do not prevent NPS from taking the actions proposed in the GMP. The legislative history of the Isle Royale Wilderness Act stated that "the park, in general, and the prospective wilderness in particular, is substantially at its optimum visitor carrying capacity, and any further concentration of use should be promptly and properly controlled." S.Rep. No. 94–1357, at 5 (1976). Plaintiffs have not established that the average number of Park users for recent years has decreased relative to the amount of visitors the Park received in the 1970's, when the Committee Report on Isle Royale was issued. Even if they had, the overriding concept of the GMP "is to meet the diverse expectations and needs of Isle Royale visitors while emphasizing the natural quiet that is fundamental to wilderness experiences. All park areas would be available to all visitors, so long as users participate in ways that are consistent with the access, facilities, and opportunities provided." (GMP at 34.) The GMP is not based primarily on reducing the number of users of the park, but, rather, on separating different uses of the Park. While NPS' views of visitor levels are present in and relevant to the GMP, (see, e.g., GMP at 5 (stating that "[i]ncreasing visitation is resulting in resource impacts and in crowding of some campgrounds, docks, and trails")), such statements are neither contrary to the facts nor do they show the

primary goal of NPS to be the reduction of what is deemed "excess" visitor use. The GMP is not primarily justified on the basis of increasing visitor usage; even if it were, NPS' actions would be justified on the basis of the average visitors to the Park in the 1970's as compared to the most recent years for which data is available. (See, e.g., the figures in the Bieti affidavit as compared with the figures at AR 07220, 07222, 10888–9, 1097–9, 11042, 14312, 14347.)

Plaintiffs also allege that NPS has violated the APA by failing to identify a numerical carrying capacity for the island. They point to 16 U.S.C. § 1a–7(b), which provides that "General Management Plans for each unit shall include, but not be limited to: ... (3) identification of and implementation commitments for visitor carrying capacities for all areas of the unit." *Id.*

The quoted language from 16 U.S.C. § 1a–7 is repeated, almost verbatim, at page 26 of the GMP. The GMP then states that "[t]he proposed action and each of the action alternatives assume that managers would take action to keep visitation levels in line with the goals of the alternative and would maintain quality visitor experiences and resource protection." (GMP at 26.) In addition, the "Visitor Experience and Resource Protection Plan" (VERPP) adopted at page 28 of the GMP includes plans to zone wilderness. These zones are to be managed so as to regulate the number of visitors in each zone. (*Id.* at 28–33.) In particular, the second element of the VERPP is "selection of indicators to ensure that [zoning] goals are being met." (*Id.* at 28.) Defendants have also indicated that "[u]se limits would probably become necessary in some zones in order to prevent overcrowding." (*Id.* at 34). Defendants' actions are in substantial compliance with the requirement that they iden-

tify a carrying capacity, since they take carrying capacity into account and commit Defendants to monitoring the carrying capacity of the various areas of the Park. Plaintiffs have pointed to no case in which an NPS action was invalidated due to lack of identification of a specific numerical carrying capacity in a GMP.

### VI. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted, and Plaintiffs' motion for summary judgment will be denied. Defendants' motions to strike will also be denied.

An Order consistent with this Opinion will be entered.